IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FIRST BANK OF DELAWARE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF

1.  This case involves an arbitrary, capricious and unlawful imposition of a temporary cease and desist order ("Order") issued by the Federal Deposit Insurance Corporation ("FDIC") against the First Bank of Delaware ("Bank") in violation of the Federal Deposit Insurance Act (the "Act"), 12 U.S.C. §§ 1811, 1818. The Bank is moving for a preliminary and permanent injunction limiting or suspending the enforcement, operation or effectiveness of the Order issued by the FDIC on July 3, 2008.

## NATURE OF THE ACTION

2.  Without any support, this Order seeks to prevent a standard, profitable and low-risk transaction involving the acquisition of credit card accounts ("Proposed Acquisition") by the Bank. The Bank is a Highly-capitalized and profitable bank, having a risk-based capital ratio nearly four times the requirement for a "well capitalized" bank.

3.  To support its Order, the FDIC makes false and unsupportable assertions that the Proposed Acquisition would somehow weaken the financial condition of the Bank. On the contrary, rather than weakening the Bank's financial condition, as the FDIC

#9824113 v1

asserts, the Proposed Acquisition poses little or no risk to the Bank, but rather would enhance the Bank's already strong economic condition.

4. The FDIC, in its Findings of Fact and Conclusions of Law ("Findings of Fact"), recites no evidence to support its justifications to block this transaction, and comes nowhere near to making the showing required by the statute. Nor has the FDIC explained how the Proposed Acquisition would create risk to the Bank of the kind necessary to meet the statutory criteria for issuance of the Order.

5. When the Proposed Acquisition is completed, the Bank will own additional credit card accounts that have been owned by another FDIC-insured bank for some time. The economic risk associated with these accounts, however, already has been transferred to third parties, who will have no recourse to make claims against the Bank.

6. Any new credit card receivables that may be generated out of the newly-acquired credit card accounts will be purchased by third parties on a daily basis pursuant to contractual commitments. In addition, the Bank through contractual relationships has more than adequate indemnification.

7. The FDIC's assertions regarding the risks of the Proposed Acquisition were made without even reviewing the contractual terms and related agreements which were still in formation on July 3, 2008, when the Order was served. The FDIC never discussed the Proposed Acquisition with the Bank to understand the transaction before peremptorily issuing its Temporary Order.

8. The Bank in this Complaint avails itself of its statutory due process rights to independent judicial review and injunctive relief from the FDIC's arbitrary action.

8. The Bank in this Complaint avails itself of its statutory due process rights to independent judicial review and injunctive relief from the FDIC's arbitrary action.

## PARTIES

9. The Bank is a Delaware-chartered insured depository institution based in Wilmington, Delaware.

10. The FDIC is a federal agency of the United States.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 12 U.S.C. § 1818(c)(2).

12. Venue is proper under 12 U.S.C. § 1818(c)(2) and 28 U.S.C. § 1391(b) because the Bank is headquartered in Wilmington, Delaware, and a substantial part of the events giving rise to this action occurred in this district.

## FACTS

13. This case involves one of the best-capitalized banks in the country contemplating a transaction for the purchase of credit card accounts that would only make the Bank even stronger. While contractual negotiations related to the Proposed Acquisition were underway at the time the FDIC Order was delivered to the Bank, the contract and its terms had not been finalized. The FDIC arrived at its conclusions regarding the purported risks associated with the Proposed Acquisition without waiting to review the actual contract, which is still to be finalized, and without any analysis of its financial effect on the Bank. The FDIC did not even contact the Bank to discuss the Proposed Acquisition before peremptorily issuing its Order.

## Statutory Framework

14. The Act, 12 U.S.C. § 1818, empowers Federal banking agencies, such as the FDIC, to issue temporary cease and desist orders, only in rare instances and after significant findings and allegations of matters that are "likely to cause insolvency or significant dissipation of assets or earnings of the depository institution, or is likely to weaken the condition of the depository institution or otherwise prejudice the interests of its depositors prior to the completion of the proceedings …."  12 U.S.C. § 1818(c)(1). None of these exists here.

15. The authority to issue temporary cease and desist orders rarely is employed, and must, by statute, be reserved for emergency situations. To ensure due process, the Congress provided for meaningful judicial review and injunctive relief of the kind requested here where the agency has misused its powers.

16. The Act expressly permits the Bank to apply to the District Court for the district in which the Bank is located – the District of Delaware – "for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness" of the FDIC's temporary cease and desist order. 12 U.S.C. § 1818(c)(2).

## The FDIC Fails to Meet the Statutory Criteria for Issuance of an Order

17. On July 3, 2008, shortly after 4:00 p.m., the FDIC, precipitously and without any prior notice, served the Bank with the Order prohibiting it from acquiring any portfolios of consumer credit card accounts from Columbus Bank and Trust Company, Columbus, Georgia ("CB&T"); CompuCredit Corporation, Atlanta, Georgia ("CompuCredit"), or any other insured depository institution or other entity until

extensive operating and capital plans of an unspecified nature have been submitted to the Regional Director for her prior non-objection. The Order is effective upon service.

18. On July 3, 2008, concurrent with service of the Order, the FDIC issued purported Findings of Fact and Conclusions of Law ("Findings") in support of the Order.

19. Approximately three weeks earlier, on June 10, 2008, the FDIC, pursuant to the statutory powers provided under 12 U.S.C. § 1818(b), commenced an administrative cease and desist proceeding against the Bank and the Bank, on June 30, 2008, responded to the Notice with a detailed Answer refuting the contentions and requesting the statutorily-provided administrative hearing before an Administrative Law Judge.

20. The FDIC relies upon the false and unsubstantiated allegations contained in its June 10 Notice to support its issuance of the Order in this case.

21. The allegations in the FDIC's June 10 Notice are the subject of an ongoing administrative proceeding before an Administrative Law Judge, and this Court need not, and cannot, consider the administrative action in resolving this separate, statutorily-authorized complaint challenging the legality of the Order.

22. In the Order, the FDIC simply recites the statutory language and without factual support asserts that the Bank's intention to enter into the Proposed Acquisition is likely to cause insolvency or significant dissipation of the assets or earnings of the Bank, or is likely to weaken the condition of the Bank or otherwise prejudice the interest of the depositors of the Bank.

23. The FDIC asserts, in paragraphs 35 through 39 of its Findings, that the "Proposed Acquisition of Additional Subprime Credit Card Accounts Poses Increased Risks." Nowhere does the FDIC recite any facts to show how the Proposed Acquisition

results in increased risk to the Bank, nor does it articulate how it has arrived at this conclusion.

24. The FDIC has failed to provide evidence supporting its conclusions, which constitute the statutory criteria it must meet to support the issuance of the Order under 12 U.S.C. § 1818(c)(1).

25. In fact, contrary to the FDIC's conclusory statements, rather than weakening the Bank, the Proposed Acquisition would be highly beneficial to the Bank, by providing significant additional revenue with very little risk thus strengthening the Bank's already strong earnings and capital position.

26. If the Bank is prevented from proceeding with the Proposed Acquisition, this substantial and beneficial opportunity will be lost. Thus, the opportunity to add to the Bank's income would be lost forever.

27. While the Order is in effect, other potential sellers of credit card accounts would be unlikely to sell their accounts to the Bank, thus depriving the Bank of access to other valuable business opportunities as well as goodwill.

### The Bank is Extraordinarily Well Capitalized

28. The FDIC in paragraph 13 of its Findings of Fact states that "the aggregate dollar volume of the NCP Division's outstanding loans were $287.8 million, ten times the Bank's capital. As of December 31, 2007, the aggregate dollar volume had increased to $748.5 million. As of March 31, 2008 the aggregate dollar volume was $682 million."

29. The unsupported implication of paragraph 13 cited above, as well as the Order's requirement that the Bank supply a new capital plan, seems to be that the Bank

does not have enough capital to enter into the Proposed Acquisition without putting the Bank at risk. This is demonstrably false based on the FDIC's own standards and methodologies regarding capital adequacy.

30. By the FDIC's own standard measures, the Bank's capital is well in excess of what would be required to support the level of credit card accounts maintained at the Bank as well as those that would come to the Bank as a result of the Proposed Acquisition.

31. The Federal Financial Institutions Examination Council ("FFIEC") is a statutorily-created entity made up of the federal bank regulatory agencies for the purpose of coordinating certain activities of the agencies. The FDIC is a member of the FFIEC. As a service to the banking industry, the FFIEC promulgates on a quarterly basis the Uniform Bank Performance Report ("UBPR"), which evaluates and compares the financial reports of all commercial banks in the United States with their peer banks.

32. A review of the most recent UBPR demonstrates that the Bank is extremely well capitalized. As of March 2008, the Bank was in a peer group of 317 banks that includes all insured commercial banks having assets between $100 million and $300 million in a metropolitan area with two or fewer full services offices.

33. The Bank's capital levels and ratios are far in excess of those required for a "well capitalized bank." The Bank's capital and earnings are sufficient to support the activity. The Bank's Tier I leverage and return on equity are historically at high levels, consistent with the Board's commitment to ensure a safe and sound cushion for Bank activities.

34. The UBPR reflects that the Bank's total capital had grown from $27 million as of March 31, 2007 to $36.3 million as of March 31, 2008.

35. As of September 30, 2007, the Bank's risk based capital ratio was 33.26% -- more than three times the 10% risk capital ratio required for a well-capitalized bank. The UBPR as of March 31, 2008 shows that the Bank's risk based capital ratio had now risen to 39.99%, nearly four times the requirement for a "well capitalized" bank and that this put the Bank in the 96th percentile for its peers, whose average ratios were 14.80%.

36. In September 2007, the Bank's leverage capital amounted to 24.46%, nearly five times the 5% ratio required for a "well capitalized" bank. As of the March 2008 the UBPR reflects that the leverage ratio had increased to 29.51%, nearly six times the regulation's requirement for a "well capitalized" bank and that the Banks ratio was in the 98th percentile for its peer group, which average was 10.32%.

37. In paragraph 1(a)(iii) of the Order, the FDIC states that the Bank must mitigate all risks by "identifying satisfactory sources of additional capital to meet the Bank's current and future needs resulting from the subprime credit card accounts to be acquired...."

38. Despite the Bank's high capital ratios, the FDIC instructs the Bank to develop a new capital plan, but fails to articulate any objective standard by which it is evaluating the Bank and refuses to explain why its standard measures do not apply here.

39. The Bank has on several occasions requested the FDIC to provide guidance as to how the FDIC would expect the Bank to determine the capital it should hold against its credit card accounts, and has been unable to secure any guidance from that agency.

40. In fact, the FDIC arbitrarily has asserted or implied that the Bank's capital levels are inadequate, apparently applying secret standards which, to the Bank's knowledge, have never been applied to any other bank in the United States.

41. For the year ending December 31, 2006, the Bank's return on assets (ROA) was 3.26%, and for the nine months ending September 30, 2007, it was 5.34%. As of March 2008 the ROA had increased to 7.38% which put the Bank in the 98th percentile in comparison to its peer group of 0.89%. These earnings are supportive of the Bank's capital base as the Bank pays no dividends and retains 100% of earnings. The Bank is clearly one of the most "well-capitalized" banks in its peer group.

**The Proposed Acquisition Involves Little or No Risk**

42. Prior to the issuance of the Order, the Bank was negotiating to acquire a portfolio of credit card accounts that would be transferred to it from CB&T and which would be serviced by CompuCredit pursuant to an affinity agreement that the Bank previously entered into with CompuCredit ("Affinity Agreement").

43. Under the Proposed Acquisition, CB&T would transfer existing Visa accounts, but not account balances, to the Bank which would be converted to the Bank's Master Card and Visa Card accounts following the acquisition.

44. While the accounts to be acquired have an outstanding balance of approximately $227 million as of June 30, 2008, the accounts receivable represented by this balance are not being acquired by the Bank having already been acquired by a third party on a non-recourse basis and therefore present no credit risk to the Bank.

45. After transfer of the accounts, the Bank would receive substantial fees from CompuCredit, and CompuCredit would continue to service the accounts just as it has serviced the Bank's accounts originated under its existing Affinity Agreement.

46. The additional fee income that the Proposed Acquisition would significantly increase the Bank's non-interest income with little, if any, incremental increase in the Bank's expenses or additional impact on capital or liquidity.

47. The Bank will not be responsible for funding these balances. Moreover, all of the collection efforts and related expenses, as well as the entire risk of non-collection, is borne exclusively by third parties unaffiliated with the Bank.

48. Fifty eight percent (58%) of these accounts are active and have an aggregate credit availability ("open to buy") of $27.5 million, but based on this portfolio's historical performance, the Bank estimates that the average daily settlement for receivables arising from card usage would only be approximately $470,000.

49. The Affinity Agreement provides that CompuCredit will purchase on a non-recourse basis one-hundred percent (100%) of the receivables in excess of a retained $200,000 base. The Affinity Agreement specifically provides for the Bank to have the benefit of a Letter of Credit or a deposit account as security for the Bank in the event that CompuCredit fails to make the required purchase. Since the beginning of its relationship with CompuCredit, the Bank has never had to avail itself of this provision. The Affinity Agreement likewise includes an indemnification provision.

50. New accounts receivable that are generated from continued card usage of the active accounts must be purchased on a daily basis from the Bank by CompuCredit pursuant to the Affinity Agreement.

51. CompuCredit has honored its obligations to purchase receivables pursuant to its Affinity Agreement with the Bank each and every day, without fail, since the beginning of the affinity relationship in mid 2005.

52. In addition, while CompuCredit has never failed to make a required purchase of receivables, as noted below the Bank has instituted robust financial and other contingencies in the unlikely event that such a default were ever to occur in the future.

53. The Proposed Acquisition would considerably enhance the Bank's revenues with virtually no increase in offsetting expenses. It would pose no risk to the Bank, which is not addressed by the long-standing safeguards in the Affinity Agreement and the funding contingencies the Bank has established.

**Additional Safeguards Protect the Bank from Economic Risk**

54. The Order also requires that the Bank fully mitigate any funding risk that would be attendant to any acquisition of a portfolio of accounts.

55. Any funding risk resulting from the Proposed Acquisition is mitigated by the contingency plans that are already in place as a back stop to protect the Bank in the very unlikely event of a failure by CompuCredit to purchase receivables as required by the Affinity Agreement.

56. Among other resources available to it, as of March 31, 2008, CompuCredit had funding capacity available from asset securitizations greatly in excess of the maximum amount that could be charged for all active accounts. This ready access to funding fully supports CompuCredit's obligations under the Affinity Agreement and provides more than adequate protection from the speculative risk that the Bank may need,

at some unknown future date, to fund the receivables from accounts acquired in the Proposed Acquisition.

57. The Bank also has established a detailed contingency plan to take immediate steps to terminate card accounts and otherwise limit its required funding needs, if necessary. Under this plan, the Bank would fully implement the steps needed to limit the exposure to additional receivables within 72 hours of a default by CompuCredit.

58. The Bank has substantial resources that could be tapped in the event of a purchase default by CompuCredit. These protections include access to a $12 million reserve account at the Bank created by CompuCredit to provide interim funding in the event of a purchase default. Based upon the average daily volume of CompuCredit related receivables, even as increased by the Proposed Acquisition, the funds from this reserve account would be enough to cover credit card charges for at least five days, which is sufficient time for the Bank to stop new charges incurred by consumers on the outstanding cards in the unlikely event this became necessary.

59. The Bank has unutilized borrowing capacity with the Atlantic Central Bankers Bank and Federal Home Loan Bank of Pittsburgh in excess of $30 million, an amount that would be well in excess of any projected short-term liquidity needs in the very unlikely event that the existing financial support from CompuCredit, and the additional protections noted above, were not sufficient.

60. In sum, the Order is arbitrary and was imposed in an unreasonable manner. Rather than litigate the issues as provided by 12 U.S.C. § 1818(b), the FDIC seeks summarily to prevent the Bank from conducting its legitimate and profitable business even though the statutory criteria for a temporary order have not been satisfied.

## FIRST CAUSE OF ACTION
### (For Injunctive Relief Pursuant to the Federal Deposit Insurance Act)

61.  All of the allegations contained in paragraphs 1 - 60 are incorporated by reference as if set forth fully herein.

62.  The FDIC, in the issuance of the Order, failed to meet the statutory criteria prescribed in 12 U.S.C. § 1818(c)(1).

63.  The FDIC has not established, and has not even attempted in its Findings of Fact to provide support for its contention in the Order that the Bank's activities are likely to cause insolvency.

64.  The FDIC has not established, and cannot establish, that the Bank's activities are likely to cause significant dissipation of assets or earnings of the Bank.

65.  The FDIC has not established, and cannot establish, that the Bank's activities are likely to weaken the condition of the Bank.

66.  The FDIC has not established, and cannot establish, that the Bank's activities otherwise prejudice the interests of the depositors of the Bank.

67.  A number of the provisions of the Order are unsupported by the underlying Notice of Charges on which it must, by law, be based.

WHEREFORE, The Bank asks the Court to enter an order granting:

(a)  Judgment in favor of the Bank in the form of a preliminary and permanent injunction limiting or suspending the enforcement, operation, or effectiveness of the Order pending the completion of the administrative proceedings;

(b)　An award in favor of the Bank of its attorneys' fees, costs and expenses incurred in connection with this action; and

(c) Such other and further relief as the Court deems just.

Dated: July 11, 2008

_____
Edmond D. Johnson (Del. Bar No. 2257)
Matthew A. Kaplan (Del. Bar No. 4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6500

Of Counsel:

*Attorneys for Plaintiff First Bank of Delaware*

Jeremiah S. Buckley, Esquire
Robert B. Serino, Esquire
Matthew P. Previn, Esquire
Larry J. Stein, Esquire
BUCKLEY KOLAR LLP
1250 24th Street, N.W., Suite 700
Washington, D.C. 20037
(202) 349-8000

℀JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
First Bank of Delaware

### DEFENDANTS
Federal Deposit Insurance Corporation

(b) County of Residence of First Listed Plaintiff: **New Castle County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: **District of Columbia**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Edmond D. Johnson (#2257), Pepper Hamilton LLP, 1313 Market St., P.O. Box 1709, Wilmington, DE 19899-1709 (302) 777-6500

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS — PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**TORTS — PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☒ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
12 U.S.C. Sections 1811, 1818

Brief description of cause:
Preliminary Injuction Action arising from a cease and desist order issued by Defendant on 7-3-08

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE ___ DOCKET NUMBER ___

DATE: 07/11/2008
SIGNATURE OF ATTORNEY OF RECORD: Edmond D. Johnson (#2257)

**FOR OFFICE USE ONLY**

RECEIPT # ___  AMOUNT ___  APPLYING IFP ___  JUDGE ___  MAG. JUDGE ___

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____

# ACKNOWLEDGMENT OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____2____ COPIES OF AO FORM 85.

__7/11/08__
(Date forms issued)

X _Andrew Hubler_
(Signature of Party or their Representative)

X _Andrew Hubler/Parcels_
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action