# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

_____

|  |  |
|---|---|
| FIRST BANK OF DELAWARE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **1:08-cv-429-GMS** |
| | ) |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

_____)   **August 4, 2008**

## DEFENDANT FDIC'S BRIEF IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Daniel H. Kurtenbach (DC Bar No. 426590)
Ashley Doherty (DC Bar No. 336073)
Thomas L. Holzman (DC Bar No. 950162)
Counsel
Federal Deposit Insurance Corporation
Legal Division, Corporate Litigation Unit
3501 N. Fairfax Drive, VS-D7022
Arlington, VA 22226
Telephone (703) 562-2237
Facsimile (703) 562-2477
dkurtenbach@fdic.gov
adoherty@fdic.gov
thholzman@fdic.gov
*Attorneys for Defendant*
*Federal Deposit Insurance Corporation*

OF COUNSEL
Charles L. Cope (DC Bar No. 70672)
Senior Counsel

TABLE OF CONTENTS

Table of Authorities                                                                                ii

Nature and Stage of the Proceedings                                                 1

Summary of the Argument                                                                  2

Statement of Facts                                                                               2

Argument                                                                                             6

I.      A Preliminary Injunction Is an "Extraordinary and Drastic Remedy"
        Designed to Preserve the Status Quo.                                             6

II.     The Burden of Persuasion Falls on the Bank, as Moving Party, to Satisfy
        Every Element of the Four-Part Test for Preliminary Injunctions.          7

III.    The Bank Has Failed to Meet the Test for a Preliminary Injunction.      8

        A.      The Bank Has Failed to Present Any Evidence in Support
                of Its Motion                                                                            8

        B.      The Bank Cannot Succeed in Meeting Any of the Four Elements    9

                1.      The Bank Cannot Demonstrate That It Has a Reasonable
                        Probability of Success on the Merits                                    9

                2.      The Bank Cannot Demonstrate That It Will Be
                        Irreparably Harmed                                                            11

                3.      The Bank Cannot Demonstrate the Absence of Harm
                        to Others If the Preliminary Injunction Is Granted                 12

                4.      Granting the Preliminary Injunction Would Be Contrary
                        to the Public Interest                                                         14

Conclusion                                                                                          16

Certificate of Service                                                                           19

## TABLE OF AUTHORITIES

**Federal Cases**

American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
42 F.3d 1421, 1426-7 (3d Cir. 1994) — 7

Arthrex Inc. v. DJ Orthopedics LLC, 2002 WL 818062, *4 (D. Del. 2002) — 12

Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959) — 12

Bennington Foods LLC v. St. Croix Renaissance Group, LLP,
528 F.3d 176, 179 (3d Cir. 2008) — 7, 12

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995) — 10

Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995) — 8

Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32 (1975) — 6

ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) — 8

Genovese Drug Stores, Inc. v. TGC Stores, Inc. 939 F. Supp. 340, 350-51 (D.N.J. 1996) — 12

Hamilton Bank, N.A. v. Office of Comptroller of Currency,
227 F. Supp.2d 1, 8-10 (D.D.C. 2001) — 10, 16

Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) — 7, 11, 16

Investment Co. Institute v. Federal Deposit Insurance Corporation,
728 F.2d 518, 525 (D.C. Cir. 1984) — 9, 11

Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) — 7

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) — 7, 14

Munaf v. Geren, 128 S. Ct. 2207, 2219 (2008) — 6

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
Pharmaceuticals Co., 290 F.3d 578, 586 (3d Cir. 2002) — 6, 8, 12

Opticians Ass'n of America v. Independent Opticians of America,
920 F.2d 187, 192 (3d Cir. 1990) — 8

Sampson v. Murray, 415 U.S. 61, 88, (1974) — 12

St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Government of U.S. Virgin Islands
ex rel. Virgin Islands Dep't of Labor, 357 F.3d 297, 301 (3d Cir. 2004)                    7

Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33-34 (2nd Cir. 1995)  7

**Federal Statutes**

12 U.S.C. § 1818(a)(2)                                                      15

12 U.S.C. § 1818(b)                                                        15

12 U.S.C. § 1818(c)                                                    1, 9, 15

12 U.S.C. § 1818(c)(2)                                                      1

12 U.S.C. § 1818(e)                                                        15

12 U.S.C. § 1820(b)                                                        15

12 U.S.C. § 1820(c)                                                        15

15 U.S.C. § 45(a)                                                          4

**Federal Rules**

Advisory Committee Notes to Fed. R. Civ. P. 6                                2

Fed. R. Civ. P. 5(b)(2)(C)                                                  2

Fed. R. Civ. P. 6(a)                                                       2

Fed. R. Civ. P. 6(d)                                                       2

**Federal Regulations**

12 C.F.R. § 364                                                            3

**Local Civil Rules**

D. Del. LR 7.1.2(a)                                                        8

iii

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

_____
                                                              )
FIRST BANK OF DELAWARE,                    )
                                                              )
Plaintiff,                                                   )
                                                              )
                              v.                            )         **1:08-cv-429-GMS**
                                                              )
FEDERAL DEPOSIT INSURANCE          )
CORPORATION,                                      )
                                                              )
Defendant.                                              )
_____)

**DEFENDANT FDIC'S BRIEF IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**Nature and Stage of the Proceedings**

On July 3, 2008, in conjunction with an administrative proceeding previously initiated by

defendant Federal Deposit Insurance Corporation (FDIC), the FDIC served the Bank with a

Temporary Order to Cease Desist (Temporary Order), together with Findings of Fact and

Conclusions of Law (Findings) (attached as Exhibits B and C),[1] pursuant to 12 U.S.C. § 1818(c).

The Temporary Order prohibits the Bank from acquiring any portfolios of consumer credit card

accounts until the Bank submits appropriate operating and capital plans that address and mitigate

the risks of its subprime credit card lending programs.  Temporary Order at 2-3.

First Bank of Delaware (Bank) brought this action against the FDIC pursuant to 12

U.S.C. § 1818(c)(2), seeking a "preliminary or permanent injunction limiting or suspending the

enforcement, operation or effectiveness" of the Temporary Order issued by the FDIC.

---

[1] Temporary Order to Cease and Desist, In the Matter of First Bank of Delaware, No. FDIC-08-151c7b, FDIC-07-256b (July 3, 2008); Findings of Fact and Conclusions of Law, In the Matter of First Bank of Delaware, No. FDIC-08-151c&b, No. FDIC-07-256b (July 3, 2008).

Complaint, D.I. 1 at 13.  Shortly after filing its complaint, the Bank filed its motion for a preliminary injunction.  D.I. 4.  The FDIC now opposes that motion.[2]

## Summary of the Argument

1.  A preliminary injunction is an "extraordinary and drastic remedy" that is designed to preserve the status quo pending resolution of a dispute.

2.  The burden of persuasion is on the Bank, as the party seeking a preliminary injunction, to satisfy every element of the four-part test applicable to grants of such relief:

- that there is a reasonable probability of success on the merits;

- that denial of an injunction will cause it to suffer irreparable injury;

- that harm will not befall other interested persons, including the FDIC as the non-moving party, if a preliminary injunction is granted; and

- that granting injunctive relief is in the public interest.

3.  The Bank has failed to meet that burden.  Specifically, it has failed to offer any evidence in support of its motion; in any event, the Bank could not overcome the evidence offered herewith by the FDIC.  Therefore, the Bank's motion for a preliminary injunction should be denied.

## Statement of Facts

The Bank is a state nonmember bank whose primary federal regulator is the FDIC. Findings at ¶¶ 1-3.  The Bank does not operate like a regular community bank by making commercial and mortgage loans.  Declaration of Doreen R. Eberley (Eberley Decl.) (Exhibit D to

---

[2] Although plaintiff's motion was filed in court on July 14, 2008, no FDIC attorneys had entered an appearance at the time of filing, and thus were not served via ECF.  Plaintiff mailed a service copy to FDIC on July 16, 2008, and pursuant to Fed. R. Civ. P. 5(b)(2)(C), service was complete on mailing.  The 10-day period under Fed. R. Civ. P. 6(a), beginning July 16, expired on Wednesday, July 30.  The additional three-day period under Fed. R. Civ. P. 6(d) expired on Saturday, August 2, making the last day for action Monday, August 4.  *See* Advisory Committee Notes to Fed. R. Civ. P. 6, 2005 Amendments.

this brief) at ¶ 6.  Instead, the Bank has at least fifteen relationships with third party providers, including credit card providers, who service the accounts originated by the Bank, and then buy the receivables charged on those credit card accounts from the Bank on a daily basis.  Findings at ¶¶ 5, 6, 9.  The Bank targeted most of its credit card products at consumers who had inadequate or poor credit histories and, consequently, limited credit options.  Findings at ¶ 7; Eberley Decl. at ¶¶ 7-8.  Despite significant reliance on third party providers for many of the Bank's products, the Bank has demonstrated a continued failure to adequately oversee and monitor its third-party lending programs.  Findings at ¶ 20; Declaration of Colleen M. Marano (Marano Decl.) (Exhibit E to this brief) at ¶ 6.  Because of that failure to manage its third party lending relationships, in both 2006 and 2007, FDIC examinations cited the Bank for numerous unsafe or unsound practices and violations of law.  Findings at ¶ 21; Marano Decl. at ¶ 6.  The Bank lacks an adequate system of internal controls, internal audit, management information systems, and compliance management over its third party lending programs.  Findings at ¶¶ 23-25.  The Bank's subprime credit card lending practices caused the Bank to fail to comply with the FDIC's Safety and Soundness Guidelines, 12 C.F.R. § 364, Appendix A.  Findings at ¶ 35.

The Bank's attempts to correct deficiencies identified by the FDIC were incomplete and ineffective.  Notice of Charges at ¶ 118(a); Eberley Decl. at ¶ 17.

On June 10, 2008, the FDIC instituted an administrative proceeding against the Bank and CompuCredit Corporation of Georgia.  The FDIC's Notice of Charges[3] (attached as Exhibit A to this brief) lays out in great detail the violations of laws and regulations and unsafe or unsound

---

[3] Notice of Charges for an Order to Cease and Desist and for Restitution; Notice of Assessment of Civil Money Penalties; Findings of Fact and Conclusions of Law; Order to Pay; and Notice of Hearing, In re First Bank of Delaware, Wilmington, Delaware, and CompuCredit Corporation, Atlanta, Georgia, No. FDIC-07-256b, No. FDIC-07-257k (June 10, 2008).

banking practices that form the basis for the FDIC's administrative proceeding against the Bank. Specifically, the Bank operated its National Consumer Products Division (NCP Division):

- without effective oversight or adequate supervision, Notice of Charges at ¶ 118(a)-(f);

- with an inadequate system of internal controls, Notice of Charges at ¶ 119(a)-(c);

- with an inadequate management information system, Notice of Charges at ¶ 120(a)-(e);

- with an inadequate internal audit system, Notice of Charges at ¶121(a)-(f);

- with an inadequate compliance management system, Notice of Charges at ¶ 122(a)-(e); and

- without policies, practices or systems that comply with federal policies and guidelines, Notice of Charges at ¶ 123(a)-(e).

In connection with its lending activities, the Bank engaged in various unfair or deceptive acts and/or practices, in violation of section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a). Notice of Charges at ¶ 11. Those practices include:

- sending out written solicitations that misled consumers into believing that they would receive a credit card with available credit, without adequately disclosing the significant up-front fees that would be charged, Notice of Charges at ¶¶ 21-40, 49-56, 70-98;

- automatically, and with no prior notice, placing consumers who were more than 90 days delinquent on their credit card accounts into a payment reduction program that resulted in an increase in the overall account balances and possibly the imposition of additional fees, Notice of Charges at ¶¶ 41-48;

- misleading consumers into believing they would immediately receive credit cards, with their prior charged-off debts transferred to the new cards and reported to consumer

reporting agencies as being paid in full, when the consumers actually were entered into a debt repayment program, Notice of Charges at ¶¶ 57-69;

- placing improper conditions on extensions of credit, Notice of Charges at ¶¶ 98-99;

- failing to protect nonpublic, personal information about consumers, Notice of Charges at ¶¶ 100-05;

- improperly discriminating against customers, Notice of Charges at ¶¶106-07; and

- violating other laws and regulations.  Notice of Charges at ¶¶ 108-13.

The Notice of Charges also stated that the Bank engaged in other, management-related, "unsafe or unsound practices."  Notice of Charges at ¶¶ 114-23.  The FDIC had advised the Bank's board of directors and management of the unsafe or unsound lending practices, especially concerning the Bank's subprime credit card portfolio, in which the Bank had been engaged since at least 2006, and required the Bank to correct those practices.  Findings at ¶ 21; Eberley Decl. at ¶¶ 9, 17; Marano Decl. at ¶¶ 9, 12.

Through the supervisory process and the filing of the Notice of Charges, the Bank was aware of the FDIC's substantial concerns about the Bank's lack of risk management and oversight over its third party lending relationships.  Notice of Charges at ¶ 118(a); Eberley Decl. at ¶¶ 9, 17-18.  Despite those concerns, the Bank was finalizing plans to acquire a portfolio of nearly 400,000 credit card accounts with outstanding balances of approximately $220,000,000 that a third party provider was going to service.  Findings at ¶¶ 30, 34.  When the FDIC learned of the imminent acquisition, the FDIC determined it was reasonable to believe that if the Bank acquired hundreds of thousands more credit card accounts without an adequate risk management infrastructure, it would seriously weaken the financial condition of the Bank.  Findings at ¶¶ 38, 39.

Accordingly, on July 3, 2008, approximately three weeks after issuing the Notice of Charges, the FDIC served the Bank with the Temporary Order and the Findings. The Temporary Order prohibits the Bank from acquiring any portfolios of consumer credit card accounts until the Bank submits appropriate operating and capital plans that address and mitigate the risks of its subprime credit card lending programs. Temporary Order at 2-3.

The Temporary Order does not preclude either the Bank, or its third party providers from continuing to conduct any of its existing third party lending programs. The Temporary Order is limited to preventing the Bank's acquisition of additional portfolios of a single type: consumer credit card accounts. Further, the Bank can once again acquire additional consumer credit card portfolios as soon as it complies with the requirements of the Temporary Order to put appropriate operating and capital plans in place.

## Argument

### I.    A Preliminary Injunction Is an "Extraordinary and Drastic Remedy" Designed to Preserve the Status Quo.

As the Supreme Court recently reiterated, "A preliminary injunction is an 'extraordinary and drastic remedy'; it is never awarded as of right." *Munaf v. Geren,* 128 S. Ct. 2207, 2219 (2008) (internal citations omitted); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) ("The standard to be applied . . . in deciding whether a plaintiff is entitled to a preliminary injunction is stringent.").

The U.S. Court of Appeals for the Third Circuit has stated that "an injunction is 'an extraordinary remedy, which should be granted only in limited circumstances.'" *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002), *quoting Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797,

800 (3d Cir. 1989); *see also American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-7 (3d Cir. 1994).

"[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal citation and quotation marks omitted); *see also St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Government of U.S. Virgin Islands ex rel. Virgin Islands Dep't of Labor*, 357 F.3d 297, 301 (3d Cir. 2004) ("Purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.")

## II. The Burden of Persuasion Falls on the Bank, as Moving Party, to Satisfy Every Element of the Four-Part Test for Preliminary Injunctions.

A preliminary injunction should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), *quoting* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, § 2948 at 129-30 (2d ed. 1995)(emphasis in original). "[W]hat is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher." *Id.* "Moreover, where the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008), *citing Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2nd Cir. 1995).

Before granting a preliminary injunction, a "District Court must be convinced that the following factors favor granting preliminary relief:  (1) the likelihood that the moving party will

succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d at 586, *citing Clean Ocean Action v. York*, 57 F.3d 328, 331 (3d Cir. 1995). "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir. 1990), *citing ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

### III.    *The Bank Has Failed to Meet the Test for a Preliminary Injunction.*

A.    The Bank Has Failed to Present Any Evidence in Support of Its Motion.

The Bank's Motion for a Preliminary Injunction asserts that the Temporary Order will cause "irreparable harm" to the Bank; that it will harm unidentified "other interested persons"; and that a preliminary injunction would "serve the public interest." PI Motion, D.I. 4 at ¶¶ 6-9. However, the Bank has produced no evidence whatsoever, either testimonial or documentary, to support these claims.[4]

As the Bank itself argues, a preliminary injunction cannot issue unless the movant establishes "that denial of injunctive relief will result in irreparable injury." PI Motion, D.I. 4 at 3. Given the Bank's failure to present any evidence of irreparable harm, or any evidence that would satisfy the other three elements required for issuance of an injunction, the Bank's Motion for a Preliminary Injunction should be denied. However, as discussed below, a review of the

---

[4] Contrary to D. Del. LR 7.1.2(a), which requires that a moving party clearly articulate in the body of the motion the grounds in support of the relief requested, or accompany the motion with a supporting brief or memorandum, plaintiff's scanty, unaccompanied motion offers only a few vague allegations and suggests that a supporting memorandum will be coming along at some indeterminate point in the future. *See* D.I. 4 at 5.

Bank's allegations and the record shows plainly that the Bank would fail to meet all elements of the four-part test.

B.     The Bank Cannot Succeed in Meeting Any of the Four Elements.

1.  *The Bank Cannot Demonstrate That It Has a Reasonable Probability of Success on the Merits.*

In its Complaint for injunctive relief (D.I. 1 at 12), the Bank recites its claims that the FDIC "has not established, and cannot establish" the various facts and conclusions underlying the Notice of Charges.  Contrary to plaintiff's claims, the FDIC has set out, in exhaustive detail, the violations of laws and regulations and the unsafe and/or unsound practices requiring the FDIC to act.  The 40-page Notice of Charges (not including the extensive exhibits) is attached as Exhibit A to this brief, and sets out the factual and legal underpinnings for the FDIC's actions.  In addition, Exhibit C to this brief sets out the specific actions and violations that required the FDIC to take immediate action by means of the Temporary Order.  In further support, the FDIC offers two sworn declarations, by Doreen R. Eberley, Regional Director of the FDIC's New York Region (Exhibit D), and Colleen M. Marano, Supervisory Bank Examiner (Exhibit E), testifying in detail to the circumstances leading the FDIC to take remedial action against the Bank.

The U.S. Court of Appeals for the D.C. Circuit has stated that 12 U.S.C. § 1818(c) (providing for temporary orders to cease and desist) "requires a showing that there is a reasonable, not merely a theoretical, possibility of insolvency or other serious financial weakening of a bank before the FDIC may issue a temporary cease and desist order."  *Investment Co. Institute v. Federal Deposit Insurance Corporation,* 728 F.2d 518, 525 (D.C. Cir. 1984), *citing* S. Rep. No. 1482, 89th Cong., 2d Sess. 1 (1966), U.S. Code Cong. & Admin. News at 3532-33; *see also CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746

(D.C. Cir. 1995)("Because OTS *reasonably* believes . . . [t]he temporary cease and desist order was thus proper")(emphasis added).

The United States District Court for the District of Columbia described the standard for upholding a temporary cease and desist order as follows:

> A number of courts have adopted the *prima facie* framework as a useful tool of analysis for determining whether the agency has acted appropriately in issuing a temporary cease and desist order. In these cases, the courts have held that a *prima facie* case requires "a verified statement of the specific facts giving rise to the violations or improprieties". . . .
>
> . . . [T]he "object of judicial review [of a temporary cease and desist order] is to ensure that a factual and statutory basis exists for the agency's action and that the temporary order comports with the scope of the [agency's] powers."
>
> * * * *
>
> . . . [T]he issuance of a temporary cease and desist order . . . is an emergency measure, which is to be used without pause or delay for presentations or negotiations where the [agency] determines that the allegedly unsafe or unsound banking practices are likely to cause harm to the financial condition of the bank. [The agency] made such a determination, and so long as that determination is properly supported, the bank's challenge to the issuance of the Temporary Cease and Desist Order must fail.

*Hamilton Bank, N.A. v. Office of Comptroller of Currency*, 227 F. Supp.2d 1, 8-10 (D.D.C. 2001) (noting that the district court's jurisdiction does not extend to independent consideration of the underlying administrative proceeding) (internal citations and footnotes omitted).

Here, the extensive Notice of Charges and Findings, together with the Eberley and Marano declarations, serve as "verified statement[s] of the specific facts giving rise to the violations or improprieties," show clearly that a "factual and statutory basis exists for the agency's action," and demonstrate "a reasonable, not merely a theoretical, possibility of insolvency or other serious financial weakening" of the Bank. The evidence presented by the FDIC demonstrates that the Bank lacks an adequate system to manage the credit card portfolio it

currently maintains.  Adding new portfolios, without a system to assess and account for the

compliance, legal, reputation, counterparty, funding, operational, capital, and other risks

associated with acquisition of a credit card portfolio, creates a "reasonable, not merely a

theoretical, possibility of . . . serious financial weakening" of the Bank.  *Investment Co. Institute*

*v. Federal Deposit Insurance Corporation,* 728 F.2d at 525.

Accordingly, the Bank cannot demonstrate a reasonable probability of success on the

merits, and its motion for a preliminary injunction should be denied.

2.  *The Bank Cannot Demonstrate That It Will Be*
*Irreparably Harmed.*

The Bank alleges that if it is prevented from immediately acquiring additional portfolios

of credit card accounts, it will be deprived of "significant annual income" that would

"meaningfully increase the Bank's non-interest income."  PI Motion, D.I. 4 at ¶ 6(a).  The Bank

also alleges that it would be deprived of unspecified "other potentially-lucrative business

opportunities" and that its "reputation and goodwill" would "likely" be injured.  *Id.* at (b), (c).

These allegations are not only unsupported, they are insufficient.

The alleged economic injury to the Bank is not of the magnitude required to justify a

preliminary injunction.  The Bank does not claim that, absent an injunction, it would suffer

bankruptcy, the type of injury that "sufficiently meets the standards for granting interim relief,

for otherwise a favorable final judgment might well be useless."  *Doran v. Salem Inn, Inc.*, 422

U.S. at 432; *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802-03 (3d

Cir. 1989) (no irreparable injury where movant retained twenty percent of its business and no

evidence showed it was "likely to cease its existence"); *CityFed Financial Corp. v. Office of*

*Thrift Supervision*, 58 F.2d at 746 ("City Fed is not truly threatened with bankruptcy.").

Moreover, as the Third Circuit has held, it is insufficient to allege even that a company will "lose

11

its entire investment" if it is not plausible that the company will also go out of business. *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d at 597, *distinguishing Genovese Drug Stores, Inc. v. TGC Stores, Inc.* 939 F. Supp. 340, 350-51 (D.N.J. 1996) (where the district court "was persuaded that an injunction would have put the defendant out of business").[5]

The Bank's allegation that it would "likely" suffer injury to its reputation or goodwill is also insufficient. The Bank conjectures that "other potential sellers of credit card accounts would be unlikely to sell their accounts to the Bank, thus depriving the Bank of . . . goodwill." Complaint, D.I. 1 at ¶ 27. However, injunctive relief is not appropriate where a movant fails specifically to identify "any third parties with whom it has suffered a loss of reputation." *Bennington Foods v. St. Croix Renaissance Group*, 528 F.3d at 179.

In sum, each element of injury alleged by the Bank is purely speculative. None suffices to make a showing of irreparable injury to the Bank. In the absence of such a showing, the Bank's motion must be dismissed. "The basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88, (1974), *quoting Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506 (1959).

### 3. The Bank Cannot Demonstrate the Absence of Harm to Others If the Preliminary Injunction is Granted.

As is clear from the Notice of Charges, the Findings, and the declarations, the FDIC has determined that the Bank's proposed actions "are likely to cause a significant dissipation of the Bank's assets or earnings, or are likely to weaken the condition of the Bank." Findings at 9. In other words, there is substantial evidence that if the preliminary injunction is granted and the Bank purchases a portfolio of subprime credit card accounts, injury will follow to the Bank itself, and depending on the weakening of the financial condition of the Bank likely caused by the

---

[5]  Similarly, "loss of market share is insufficient to support a finding of irreparable harm." *Arthrex Inc. v. DJ Orthopedics LLC*, 2002 WL 818062, *4 (D. Del. 2002), *cited in* PI Motion, D.I. 4 at ¶ 3.

acquisition, the Bank's shareholders, creditors, depositors and other customers would be harmed substantially as well.  *See, e.g.,* Eberley Decl., Ex. D at ¶ 11 ("[I]f the credit card marketing is determined to be unfair or deceptive, the bank may be held responsible for any monetary penalties, reimbursements, and any other actions (such as shutting down the program) necessary to promptly address the concerns.") and ¶¶ 24, 27 ("The Bank relies on CompuCredit to purchase these receivables and could not fund the entire $204 million in available credit by itself if CompuCredit defaults . . . . The value of CompuCredit's credit card receivables are deteriorating due to economic factors, which increases the risk that CompuCredit will be unable to fulfill its obligation."); Marano Decl., Ex. E at ¶ 11("[As of] March 31, 2008, the total outstanding loan balance for all [of the Bank's] NCP Division products increased more than two-fold to $682 million, which represented more than 18 times the Bank's capital reserves.  Subprime credit card receivables represented approximately 80% of that balance.") and ¶ 17 ("[T]he [Bank's] Plan does not include provisions to reimburse consumers for prepaid annual fees if their credit cards have to be shut off.")  Because the Bank has demonstrated to the FDIC no effort to quantify the various risks it faces in acquiring any new credit card portfolio, it is reasonable to think such risk could be substantial and could cause harm to the Bank's shareholders.  Eberley Decl. at ¶ 34.  For example, the Bank has not demonstrated that it has accounted for the risk that the solicitation or issuance of some or all of the credit card accounts it seeks to purchase violated consumer protection statues; if this were the case, the Bank could face substantial liability.  Eberley Decl. at ¶¶ 32-33.  Depending on the amount, such liability could lead to substantial harm to depositors, creditors, or the deposit insurance fund.  Eberley Decl. at ¶ 35.

    To succeed on its motion for a preliminary injunction, the Bank must demonstrate that interested parties (including the Bank itself) will not be substantially harmed if the preliminary

injunction is granted.  That is, the Bank must show, under a very high burden of persuasion, that the consequences predicted by the FDIC will not happen under any reasonable scenario.  This the Bank cannot do.  Under the proposed transaction, the Bank will acquire nearly 400,000 additional subprime credit card accounts with almost $220 million in outstanding balances. Eberley Decl., Ex. D at ¶ 33.  This is not inconsequential and cannot be reversed.  The facts are straightforward and compelling.  Highly seasoned experts in determining the condition of banks (*see* Eberley Decl. at ¶¶ 1-4, Marano Decl. at ¶¶ 1-4) have concluded that allowing the transaction to occur, without a sound risk management plan in place at the Bank, would reasonably (and perhaps inevitably) have serious adverse consequences affecting a variety of interests.

Under the exacting burden of persuasion it must carry here, the Bank cannot make a "clear showing" (*Mazurek v. Armstrong*, 520 U.S. at 972) that the FDIC's conclusions are unreasonable or unsupported and thus cannot refute the FDIC's determination of harm if the transaction is allowed to occur.  Accordingly, the Bank cannot satisfy this element of the four-part test.

### 4.  Granting the Preliminary Injunction Would Be Contrary to the Public Interest.

The facts of this case compel the conclusion that the proposed injunction would seriously impede the FDIC's ability to deal swiftly with violations of laws and regulations and unsafe or unsound banking practices that threaten not only this Bank but the public's confidence in the soundness of the nation's banking system.

As set forth in the Notice of Charges, the Bank has failed to ensure it has systems in place to protect the public from illegal or unsafe or unsound credit card marketing and lending practices.  Notice of Charges at ¶ 122; Eberley Decl. at ¶ 19.  Additionally, some or all of the

credit card accounts in the portfolio to be acquired were issued in violation of applicable laws, including section 5 of the Federal Trade Commission Act.  Findings at ¶ 25; Eberley Decl. at ¶ 33.  Because the Bank has not demonstrated that it has systems in place to assess the risks associated with the credit card portfolios it intends to acquire, it can not protect those customers or the public interest by ensuring that the almost 400,000 credit card accounts were originated or are maintained in accordance with applicable laws.  Marano Decl. at ¶¶ 14-17.

As a federal bank regulator, the FDIC has been vested by Congress with a broad range of enforcement powers and authorities, from examining banks (12 U.S.C. § 1820(b)) to conducting investigations (12 U.S.C. § 1820(c)) to terminating the deposit insurance of an institution (12 U.S.C. § 1818(a)(2)) to removal of individuals from the banking industry (12 U.S.C. § 1818(e)).  A key component of that enforcement authority is the ability to issue temporary cease and desist orders (12 U.S.C. § 1818(c)) and have those temporary orders enforced by the courts (12 U.S.C. § 1818(d)).  However, in the case of an open, operating bank such as First Bank of Delaware, the temporary cease and desist order may be the only effective method of rapidly intervening to prevent a bank from carrying out schemes that are likely to weaken the bank, put individual customers and potential customers at risk of losing money, or damage the public's confidence in the banking system.

In giving the FDIC and other federal bank regulators the authority to issue temporary cease and desist orders, Congress did two things:  First, it required that such authority only be used in the context of a larger, full and fair administrative proceeding initiated by a notice of charges and statement of facts and providing for an administrative hearing.  12 U.S.C. § 1818(b).  Second, in providing for judicial review of a temporary cease and desist order, Congress specifically chose the vehicle of an injunction, "an extraordinary remedy, which should be

granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d at 800. In this way, the due process rights of the financial institution are balanced with the needs of federal regulators to carry out their statutory mandates and maintain the status quo pending resolution of the issues set out in the notice of charges.

This structure reflects the dual public interests at stake in situations like this: an interest in a full and fair process that protects the rights of individuals and businesses and an interest in a sound and secure national financial system in which regulators can address violations of law and unsafe practices swiftly. Contrary to the Bank's assertion in its motion (D.I. 4 at ¶ 9), the administrative proceedings initiated by the Notice of Charges are designed to ensure due process and that "a factual and statutory basis exists for the agency's action." *Hamilton Bank, N.A. v. Office of Comptroller of Currency*, 227 F. Supp. 2d at 8.

The Bank has failed to demonstrate that granting a preliminary injunction and allowing it to purchase more subprime credit card accounts would somehow serve the public interest. On the contrary, the public interest is quite clearly served by allowing a full and fair administrative process to proceed on the facts and circumstances contained in the Notice of Charges. Further, the public interest is served by taking seriously the risks foreseen by the Bank's regulator and temporarily maintaining the status quo until those perceived risks can be fully explored in the administrative process or voluntarily mitigated by the Bank. Accordingly, the Bank cannot meet the fourth element of the four-part test for injunctive relief.

### Conclusion

The Bank has failed to meet the heavy burden of persuasion required to justify a preliminary injunction that would disturb, rather than maintain, the status quo. The Bank has failed to demonstrate that it is likely to succeed on the merits, that it will suffer an irreparable

injury if a preliminary injunction is denied, that interested parties will not be harmed if a preliminary injunction is granted, or that granting the preliminary injunction would serve the public interest. By contrast, the FDIC has demonstrated that the Bank's proposed acquisition of approximately 400,000 more subprime credit card accounts, when the Bank lacks the ability to properly manage the accounts that it already has, or would constitute further unsafe or unsound practices likely to seriously weaken the condition of the Bank. Therefore, the Bank's motion for a preliminary injunction should be denied.

Respectfully submitted this 4th day of August, 2008,

/s/      Daniel H. Kurtenbach
Daniel H. Kurtenbach (DC Bar No. 426590)
Ashley Doherty (DC Bar No. 336073)
Thomas L. Holzman (DC Bar No. 950162)
Counsel
Federal Deposit Insurance Corporation
Legal Division, Corporate Litigation Unit
3501 N. Fairfax Drive, VS-D7022
Arlington, VA 22226
Telephone (703) 562-2237
Facsimile (703) 562-2477
dkurtenbach@fdic.gov
adoherty@fdic.gov
thholzman@fdic.gov
*Attorneys for Defendant*
*Federal Deposit Insurance Corporation*

OF COUNSEL
Charles L. Cope (DC Bar No. 70672)
Senior Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2008, the foregoing BRIEF IN OPPOSITION TO

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION was sent to the following via

First Class Mail, postage prepaid:

> Larry J. Stein
> Jeremiah S. Buckley
> Matthew P. Previn
> Robert B. Serino
> BUCKLEY KOLAR LLP
> 1250 24th Street, N.W., Suite 700
> Washington, DC 20037

/s/    Daniel H. Kurtenbach
Daniel H. Kurtenbach
Counsel, Federal Deposit Insurance
    Corporation

# EXHIBIT A

# FEDERAL DEPOSIT INSURANCE CORPORATION

## WASHINGTON, D. C.

|  |  |
|---|---|
| In the Matter of | NOTICE OF CHARGES FOR AN ORDER TO |
| FIRST BANK OF DELAWARE WILMINGTON, DELAWARE | CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF |
| (Insured State Nonmember Bank) | ASSESSMENT OF CIVIL MONEY PENALTIES; |
| And | FINDINGS OF FACT AND CONCLUSIONS OF LAW; |
| COMPUCREDIT CORPORATION ATLANTA, GEORGIA An Institution-Affiliated Party of: | ORDER TO PAY; AND NOTICE OF HEARING |
| FIRST BANK OF DELAWARE WILMINGTON, DELAWARE | FDIC-07-256b FDIC-07-257k |
| (Insured State Nonmember Bank) |  |

The Federal Deposit Insurance Corporation (FDIC), being of the opinion that

First Bank of Delaware, Wilmington, Delaware (Bank) and CompuCredit Corporation,

Atlanta, Georgia (CompuCredit), an institution-affiliated party of the Bank, have engaged

in violations of law and/or regulations and in unsafe and/or unsound banking practices

and, unless restrained, the Bank and CompuCredit will continue to engage in such

practices and violations in conducting the business of the Bank, hereby institutes this

proceeding to determine whether appropriate orders should be issued against the Bank

and CompuCredit under the provisions of sections 8(b)(1), 8(b)(6), and 8(i) of the Federal

Deposit Insurance Act (FDI Act), 12 U.S.C. §§ 1818(b)(1), 1818(b)(6), and 1818(i). The

FDIC hereby issues this NOTICE OF CHARGES FOR AN ORDER TO CEASE AND

DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY

PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO

PAY; AND NOTICE OF HEARING (collectively, NOTICE) pursuant to the provisions

of the FDI Act, 12 U.S.C. §§ 1811-1831aa, and the FDIC's Rules of Practice and

Procedures, 12 C.F.R. Part 308, and alleges as follows:

## JURISDICTION

1.      The Bank is, and at all times relevant to this proceeding has been, a

corporation organized, existing, and doing business under the laws of the State of

Delaware with its principal place of business in Wilmington, Delaware.

2.      The Bank is, and at all times relevant to this proceeding has been, a

"State nonmember bank" within the meaning of section 3(e)(2) of the FDI Act, 12 U.S.C.

§ 1813(e)(2); an "insured depository institution" within the meaning of section 3(c)(2) of

the FDI Act, 12 U.S.C. § 1813(c)(2); and subject to the FDI Act, 12 U.S.C. §§ 1811-

1831aa, the FDIC's Rules and Regulations, 12 C.F.R. Chapter III, and the laws of the

State of Delaware.

3.      CompuCredit is, and at all times relevant to this proceeding has been, a

corporation organized, existing, and doing business under the laws of the State of

Georgia, and has its principal place of business in Atlanta, Georgia.

4.      Since at least February 2005, pursuant to contractual arrangements, the

Bank and CompuCredit have engaged in credit card lending activities throughout the

United States targeted at, among others, consumers who have inadequate or poor credit

histories and, consequently, have limited credit options.

5.      At all times relevant to this proceeding, CompuCredit has been an

"institution-affiliated party" as that term is defined in section 3(u) of the FDI Act, 12

2

U.S.C. § 1813(u), and for purposes of section 8(b) and 8(i) of the Act, 12 U.S.C. §§ 1818(b) and 1818(i).

6.      Continental Finance Company, LLC (Continental Finance) is, and at all times relevant to this proceeding has been, a limited liability company organized, existing, and doing business under the laws of the State of Delaware, and has its principal place of business in Newark, Delaware.

7.      Since at least March 2006, pursuant to a contractual arrangement, the Bank, through Continental Finance, has conducted credit card lending throughout the United States targeted at, among others, consumers who have inadequate or poor credit histories and, consequently, have limited credit options.

8.      The FDIC is the "appropriate Federal banking agency", as that term is defined in section 3(q)(3) of the FDI Act, 12 U.S.C. § 1813(q)(3), with respect to the Bank, and has jurisdiction over the Bank and CompuCredit, as an institution-affiliated party of the Bank, and the subject matter of this proceeding.

9.      At all times relevant to this proceeding, the Bank's acts and practices, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 44.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

### (as to the Bank and CompuCredit)

10.     At all times relevant to this proceeding, CompuCredit's acts and practices, as an institution-affiliated party of the Bank, as described in this NOTICE, have been in or affecting "commerce," as that term is defined in section 4 of the FTC Act, 15 U.S.C. § 44.

3

11.    Beginning in at least February 2005, the Bank and CompuCredit engaged in unfair or deceptive acts and/or practices in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (Section 5), in connection with their lending activities as more fully alleged below.

12.    CompuCredit is engaged in and, since at least 1997, has been engaged in the business of providing various consumer credit products, including credit cards, short-term installment loans (ILPs) and related financial services throughout the United States. CompuCredit offers these products and services by, among other things, entering into contracts with banks, including the Bank, pursuant to which CompuCredit markets and services credit products.

13.    On or about February 16, 2005, the Bank and CompuCredit first entered into an Affinity Card Agreement (CompuCredit Affinity Agreement) providing for, among other things, the marketing and issuance of credit cards.

14.    At all times relevant to this proceeding, there has been a CompuCredit Affinity Agreement or a successor amended and/or restated Affinity Agreement in place between the Bank and CompuCredit (hereafter collectively, CompuCredit Affinity Agreements).

15.    Pursuant to the CompuCredit Affinity Agreements, the Bank issues the credit cards and owns the credit card accounts. CompuCredit markets the credit cards and services the accounts on behalf of the Bank. CompuCredit also purchases the credit card receivables from the Bank on a daily basis, and pays the Bank a monthly fee based upon the number of account statements processed.

16.    Since at least 2005, the Bank and CompuCredit marketed credit cards

4

throughout the United States under certain brand names including Tribute MasterCard,
Imagine MasterCard, Purpose Advantage Credit Card and the Embrace Visa Card
(collectively, CompuCredit Cards). The Tribute and Imagine MasterCards are referred to
internally by the Bank and CompuCredit as the Little Rock cards (Little Rock Cards).

17.    Pursuant to the CompuCredit Affinity Agreements, CompuCredit had
the sole and exclusive right to solicit applications for the CompuCredit Cards.
CompuCredit created, designed, and distributed the marketing materials; established the
credit cards' terms and conditions; developed the underwriting and credit criteria; and
maintained customer service functions.

18.    The CompuCredit Affinity Agreements required CompuCredit to submit
to the Bank for prior review and approval before they were used in connection with the
CompuCredit Cards:  (a) all marketing and solicitation materials such as mail
solicitations, telemarketing scripts, promotional material and advertising marketing; (b)
administrative materials such as manuals, training materials, policies, and written
procedures; and (c) consumer materials including cardholder agreements, billing
statements, statement inserts, and form letters.

19.    As the credit card issuer and the account owner of the CompuCredit
Cards, the Bank was responsible for ensuring that the marketing and solicitation practices
for the CompuCredit Cards complied with all applicable laws, including
Section 5.

20.    Pursuant to the CompuCredit Affinity Agreements, CompuCredit was
responsible for ensuring that the marketing and solicitation practices for the CompuCredit
Cards complied with all applicable laws, including Section 5.

## I. **Little Rock Cards Program**

21.    The Bank and CompuCredit marketed the Little Rock Cards through pre-screened direct mail solicitations, inbound and outbound telemarketing, and on the Internet.

22.    As described below, the written solicitations for the Little Rock Cards misled consumers into believing that they would receive a MasterCard credit card with $300 in available credit.  The solicitations also failed to disclose adequately the significant up-front fees that consumers would be charged.

23.    Beginning approximately July 2005, the Bank issued 366,908 Little Rock Cards to consumers who responded to these solicitations and there were more than 271,700 active accounts as of June 2006.

24.    The Bank and CompuCredit targeted consumers whose credit scores were typically between 450 and 600, and who had limited credit options.

25.    The Little Rock products were marketed as MasterCard credit cards with an initial credit limit of typically $300 with no deposit required, no deposit fee, and/or no application fee.

26.    However, initial fees, typically consisting of an annual fee of $150 and an account opening fee of $29, were charged and posted to the consumer's Little Rock account immediately after the consumer applied for and was issued a card.

27.    The Bank and CompuCredit also typically charged the consumer a monthly maintenance fee of $6.50.  In some instances, this fee was posted to the consumer's account immediately after the consumer was issued a card.  In other instances, the monthly maintenance fee was not billed to the account until the consumer

made his or her first purchase.

28.    The Little Rock Cards initial fees and charges typically of $185.50 reduced the consumer's available credit from $300 to $114.50 before the consumer ever used the card.

29.    As part of this program, consumers were required to make an initial minimum payment of $20, sometimes referred to as an "activation payment," before the Little Rock Cards could be used.

### Deceptive Marketing Materials and Practices

30.    At all times relevant to this proceeding, the Bank and CompuCredit marketed the Little Rock Cards by sending consumers direct mail solicitation packages.

31.    A typical and illustrative direct mail solicitation package contained the following items:  (1) an outside envelope; (2) a one-page cover letter; (3) a one-page document titled "MasterCard Pre-Qualified Acceptance Certificate"; (4) a folded insert titled "Introducing: the Tribute MasterCard" or "Introducing the Imagine MasterCard"; and (5) a two-sided document titled "Summary of Credit Terms" on one side and "Terms of Offer" on the other.

32.    A typical and illustrative direct mail solicitation package repeatedly and with bold emphasis used words and phrases like "pre-qualified," "no application fee," and "no deposit required."  The cover letter of the solicitation package stated that the consumer was pre-qualified for an unsecured Tribute MasterCard or Imagine MasterCard with a credit limit of $300.

33.    The solicitation failed to adequately disclose that consumers would be immediately billed the $150 annual fee, the $29 account opening fee, and for certain

solicitations, the $6.50 monthly maintenance fee. The solicitation package also did not adequately disclose that consumers would be required to make an initial payment before their Little Rock Card would be activated. For some solicitations, the package did not adequately disclose that once the card was used, a $6.50 monthly account maintenance fee would be charged to the account.

34.    A typical and illustrative direct mail solicitation package manipulated the words used or omitted words, the placement and size of the text, and the overall arrangement of the solicitation packages to represent, expressly or by implication, that consumers were pre-approved to receive a credit card that had $300 in available credit.

35.    These direct mail solicitation packages, when viewed as a whole, were deceptive in nature because they failed to adequately disclose the actual available credit, the fees and costs of the Little Rock Cards, and the impact of the fees and costs on the available credit.

36.    The solicitation package instructed consumers who wished to obtain the Tribute MasterCard or the Imagine MasterCard to complete and return the "Acceptance Certificate," call a toll-free number, or respond over the Internet.

37.    Upon the consumer's acceptance of the Little Rock Card direct mail solicitation offer, if the consumer was approved for the card, he or she was sent a fulfillment package.

38.    The fulfillment package included the consumer's Little Rock Card that was not activated, a copy of the Bank Credit Card Agreement, and a payment coupon informing the consumer that an initial payment of $20 was required before the card could be activated and used. The package also listed a phone number the consumer could call

8

to pay the initial payment by telephone. The $20 payment was applied against the consumer's Little Rock Card account balance.

39.    A typical and illustrative fulfillment package included in small type and on the reverse side of the credit card carrier information that there is an "annual fee," an "account opening fee," and a "monthly maintenance fee." This information was not as clear or prominent as, or in any proximity to, the representations about how to activate the card.

40.    The fulfillment package led consumers to believe that they were obligated to make only a $20 payment to activate the card, and did not disclose or disclosed inadequately that significant up-front fees had already been charged to their accounts.

## One Percent Minimum Payment Program for Past Due Accounts
## Little Rock Card

41.    At all times relevant to these proceedings, in numerous instances, the Bank and CompuCredit automatically, and with no prior notice, placed consumers who were more than 90 days delinquent on their Little Rock Card account into a payment reduction program known as the "1% Minimum Payment Program."

42.    At all times relevant to these proceedings, neither the payment reduction program, nor its terms and conditions, were adequately disclosed or explained to consumers prior to their being placed in the program.

43.    Under this program, consumers were allowed to pay either 1% of their outstanding balance or $10, whichever was greater.

44.    The Bank and CompuCredit represented, expressly or by implication, to

consumers whose accounts were more than 90 days past due that enrollment in this program would help them become current on their accounts.

45.     The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all the fees and charges assessed during the period of reduced minimum payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees including, but not limited to, overlimit fees.

46.     By reason of the foregoing, the Bank and CompuCredit's failure to disclose, or failure to disclose adequately, material information regarding the 1% Minimum Payment Program was a deceptive act or practice in violation of Section 5.

47.     By reason of the acts and practices described in paragraphs 10 through 46, the Bank and CompuCredit violated Section 5 as follows:

(a)     The Bank and CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a Little Rock Card with $300 of available credit by opening an account.  In fact, consumers who responded to the solicitations and opened an account received only $114.50 or $121 of available credit due to the significant fees billed immediately to their accounts.  Therefore, the Bank and CompuCredit's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)     The Bank and CompuCredit represented, expressly or by implication, that consumers were "pre-qualified" to receive a credit card with $300 of available credit with "No deposit required," "No deposit fee," and "No application fee." The Bank and CompuCredit failed to disclose, or failed to disclose adequately, that

10

consumers would be charged substantial up-front fees, including an annual fee, an account opening fee, and a monthly maintenance fee. In light of the representations made, the Bank and CompuCredit's failure to disclose, or the failure to disclose adequately, the material information about the up-front fees that consumers would be charged, was a deceptive practice.

      (c)    The Bank and CompuCredit represented, expressly or by implication, to consumers whose accounts were more than 90 days delinquent that enrollment in the 1% Minimum Payment Program would help them become current on their accounts. The Bank and CompuCredit failed to disclose the effects of the reduced minimum payments, including that such payments may not cover all fees and charges assessed during the period of reduced payments, resulting in an increase in the overall account balance and possibly the imposition of additional fees including, but not limited to, overlimit fees. The Bank and CompuCredit's failure to disclose this material information, or to disclose it adequately, was a deceptive practice.

48.    The actions alleged in paragraphs 9 through 47 above beginning in at least July 2005, represent the Bank and CompuCredit's violations of Section 5 related to the Little Rock Cards.

**II. Purpose Advantage Credit Card Program**

49.    Beginning in at least September 2005, the Bank and CompuCredit, through its two subsidiaries, CARDS Credit Services, LLC and Purpose Solutions, LLC, marketed the Purpose Advantage credit card (Purpose Advantage) through the Internet as a "guaranteed", "pre-approved" credit card with a minimum credit limit of $50 and "no enrollment fees."

50.     Beginning approximately September 2005, the Bank and CompuCredit originated more than 26,000 Purpose Advantage accounts.

51.     The Internet solicitations for the Purpose Advantage card misled consumers into believing that they would receive a credit card with a guaranteed minimum amount of credit of $50 and that there were "no enrollment fees."

52.     However, initial fees, typically consisting of an annual participation fee of $9.99 and a processing fee of $4.99, were charged to the consumer's account immediately after the consumer was approved to receive the Purpose Advantage credit card and before the consumer ever received and used the card.

53.     The annual participation fee of $9.99 and the processing fee of $4.99 reduced the consumer's available credit from $50.00 to $35.02 before the consumer ever received and used the card.

### Deceptive Marketing Materials and Practices

54.     At all times relevant to this proceeding, the Bank and CompuCredit, through its subsidiaries, CARDS Credit Services, LLC and Purpose Solutions, LLC, marketed the Purpose Advantage credit card over the Internet as a "guaranteed" "pre-approved" credit card with "no enrollment fees" and with a minimum credit limit of $50.

55.     The Internet solicitation failed to disclose, or failed to adequately disclose, that the consumer would be immediately charged a $9.99 annual participation fee and a $4.99 account processing fee prior to receiving and ever using the card.

56.     The Bank and CompuCredit's failure to disclose, or disclose adequately, the significant up-front fees in its solicitations described in paragraphs 49 through 55 was a deceptive practice in violation of Section 5.

### III.  The Embrace Visa Program

57.    At all times relevant to these proceedings, beginning in March 2006, the

Bank and CompuCredit marketed the Embrace Visa card to consumers with unpaid debts

that were charged off by prior creditors, including debts that were no longer subject to

suit under the applicable statute of limitations and debts that were no longer being

reported to consumer reporting agencies because they were outside the seven-year

limitation set forth in section 605 of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §

1681c.

58.    These unpaid debts had been previously purchased by Jefferson Capital

Systems, LLC (Jefferson Capital), a wholly-owned subsidiary of CompuCredit.  Jefferson

Capital is a limited liability company organized and existing under the laws of the state of

Georgia with its principal place of business in St. Paul, Minnesota.

59.    As described below, the Embrace Visa card direct mail solicitations

misled consumers into believing that they would immediately receive credit cards, with

their prior debts transferred to the new cards and reported to consumer reporting agencies

as paid in full.  In fact, consumers who applied for the Embrace Visa card entered into a

debt repayment program.  Consumers did not qualify for a credit card until they paid

between 25% - 50% of their charged off debt within a specified time frame, and even if

they made the required payments, consumers would receive a nominal credit line.

60.    To market the Embrace Visa card, the Bank and CompuCredit arranged

for consumers to receive direct mail solicitations from Jefferson Capital.  The Bank and

CompuCredit, through Jefferson Capital, targeted consumers with charged off debt with

principal balances between $200 and $10,000.  These direct mail solicitations included an

introductory letter from Jefferson Capital, the card offer letter, and a "Condensed Bank Credit Card Agreement."

61.    The Bank and CompuCredit used several versions of the Embrace Visa card solicitation, depending on the amount of the original charged off account balance. All of the direct mail solicitations offered consumers a "no annual fee unsecured credit card" and stated in bold type, "You're Pre-Approved for the Embrace Visa Card" or "You're Pre-Approved for the New Embrace Fresh Start Solution and Visa Card." The solicitations encouraged consumers to "Sign Up Today!" and proclaimed, "Soon you can enjoy all the convenience and benefits Visa has to offer."

62.    The Embrace Visa card direct mail solicitations informed consumers that Jefferson Capital "made an arrangement with the issuer of the Embrace Visa card to provide you with the opportunity to receive a no annual fee unsecured credit card." Consumers were also told that they were "Pre-Approved for the Embrace Visa Card." Consumers were not told that CompuCredit is both the parent company of Jefferson Capital and the company responsible for marketing the Embrace Visa card for the Bank.

63.    The Embrace Visa card solicitations included a letter from Jefferson Capital stating that the offer was "an opportunity to satisfy this debt and enjoy the convenience of a new Visa card." The solicitations represented to consumers that their charged off debt would be "transferred to a new Embrace Visa account as the first transaction on your new account." The solicitations further represented that "[a]s an added bonus, once you qualify to receive a Embrace Visa card, we will see to it that the credit bureaus are notified that your former account has been paid in full."

64.    These representations in the Embrace Visa card solicitations led

consumers to believe that: (a) they would immediately receive an Embrace Visa card

upon acceptance of their "Pre-Approved" application; and (b) their charged off debt

would be immediately transferred to an Embrace Visa card account and reported to

consumer reporting agencies as "paid in full."

65.     In fact, consumers who received the Embrace Visa card solicitations were

not "pre-approved" to receive a Visa credit card.  Rather, the Embrace Visa card program

was an attempt to collect consumers' charged off debt balances by enrolling consumers in

a debt repayment plan and, in some instances, renewing both the statute of limitations and

the credit reporting periods on consumers' charged off debt.

66.     Moreover, consumers' charged off debts were not transferred to a

Embrace Visa  card account "as the first transaction on [the] new account" or reported as

"paid in full" when consumers responded to the solicitations.  Instead, consumers were

required to pay between 25% and 50% of their originally charged off debt within 12

months before the remaining balance was transferred to the Embrace Visa card account

and the charged off debt was reported as paid in full.  Only then did the consumer

become eligible for the Embrace Visa card.

67.     Even if a consumer made sufficient payments to receive the Embrace Visa

card, the available credit was typically only about 5% of the amount of the charged off

debt balance that was transferred to the card.  As a result, the Embrace Visa card

provided the consumer with little utility for purchases or cash advances.

68.     By reason of the acts and practices described in paragraphs 9 through 20

and 57 through 67, the Bank and CompuCredit violated Section 5 as follows:

(a)     The Bank and CompuCredit represented, expressly or by

implication, that upon acceptance of a consumer's "Pre-Approved" application for an Embrace Visa card, the consumer would immediately receive an Embrace Visa card. In fact, upon acceptance of the consumer's pre-approved application, the Bank and CompuCredit did not immediately issue the consumer an Embrace Visa card. Rather, consumers were required to pay between 25% and 50% of their prior charged off debt before they would be eligible for an Embrace Visa card. The Bank and CompuCredit's representations about the immediate availability of a credit card were false or misleading and a deceptive practice.

        (b)    The Bank and CompuCredit represented, expressly or by implication, that upon acceptance of a consumer's application for an Embrace Visa card, the consumer's charged off debt would be immediately transferred to the Embrace Visa card account and be reported to the credit reporting agencies as "paid in full," and the prior debt would be satisfied. In fact, upon acceptance of the consumer's application, the Bank and CompuCredit did not transfer a consumer's charged off debt to the card, report the debt as "paid in full" to the credit reporting agencies, or deem the prior debt as satisfied. Therefore, the representations of the Bank and CompuCredit about the prior charged off debt were false or misleading and a deceptive practice.

69.    The actions alleged in paragraphs 9 through 20 and 57 through 68 above beginning in at least March 2006, represent the Bank and CompuCredit's violations of Section 5 related to the Embrace Visa card program.

## VIOLATIONS OF SECTION 5 OF THE FEDERAL TRADE COMMISSION ACT

### (as to the Bank)

70.    Beginning in March 2006 and upon information and belief continuing

through the present, the Bank and Continental Finance have engaged in unfair or deceptive acts and/or practices in violation of Section 5 in connection with their credit card lending activities as more fully alleged below.

71.    The Bank and Continental Finance are engaged in, and since at least March 2006 have been engaged in, the business of providing credit cards throughout the United States. Continental Finance offers these products and services by entering into a contract with the Bank, pursuant to which Continental Finance markets and services credit card products on behalf of the Bank.

72.    On or about February 28, 2006, the Bank and Continental Finance entered into a Credit Card Marketing Agreement (Continental Affinity Agreement) providing for, among other things, the marketing and issuance of credit cards.

73.    At all times relevant to this proceeding, there has been a Continental Affinity Agreement in place between the Bank and Continental Finance.

74.    Pursuant to the Continental Affinity Agreement, the Bank issues the credit cards and owns the credit card accounts.

75.    Since at least March 2006, the Bank and Continental Finance marketed credit cards throughout the United States under the brand names Gold MasterCard and Classic MasterCard (collectively, CFC Cards).

76.    Under the Continental Affinity Agreement, the Bank must review and approve: (a) all marketing and solicitation materials such as development and placement of Internet, print media, radio and television advertising; (b) website design and development; (c) administrative materials; and (d) consumer materials including cardholder agreements and billing statements.

77.    As the credit card issuer and the account owner of the CFC Cards, the Bank was responsible for ensuring that the marketing and solicitation practices for these cards complied with all applicable laws, including Section 5.

78.    The Bank and Continental Finance marketed the CFC Cards through Internet solicitations and direct mail solicitations.

79.    As described below, the Internet solicitations and direct mail solicitations for the CFC Cards misled consumers into believing that they would receive a CFC credit card with $300 in available credit.  The solicitations also failed to disclose adequately the significant up-front fees that consumers would be charged.

80.    From approximately March 2006 through March 2008, the Bank issued more than 240,000 CFC Cards to consumers who responded to these solicitations and there were more than 173,000 active accounts as of March 2008.

81.    The Bank and Continental Finance targeted consumers who had inadequate or poor credit histories and, consequently, limited credit options.

82.    The CFC Cards were marketed as a MasterCard credit card with an initial credit limit of typically $300 with low annual fees.

83.    However, initial fees, typically consisting of a set-up fee of $99, participation fee of $89, and an annual fee of $49 or $27 were charged and posted to the consumer's CFC Card account immediately after the consumer applied for and was issued a card.

84.    The Bank and Continental Finance also charged the consumer a monthly maintenance fee typically of $10.00.  This fee was posted to the consumer's account immediately after the consumer was issued a card.

85.    The initial fees and charges of $247 or $225 for the CFC Cards reduced the consumer's available credit from $300 to $53 or $75 before the consumer ever used the card.

86.    The Bank and Continental Finance also represented in Internet and direct mail solicitations that a consumer would receive "credit limit increases"; however, they failed to disclose, or failed to disclose adequately, that: (a) the consumer would be automatically charged $25 for each credit limit increase of $100, which could only occur twice a year; and (b) the consumer could "opt out" of the credit limit increase and thereby, avoid the charge; and (c) failure to "opt out" would result in the automatic imposition of a $25 charge for the $100 credit limit increase.

87.    The Bank and Continental Finance also represented in Internet and direct mail solicitations that a consumer would receive "FREE Online Account Access and Tools"; however, they failed to disclose, or failed to disclose adequately, that a consumer would have to pay $4 for making an account payment over the Internet.

### Deceptive Marketing Materials and Practices

88.    At all times relevant to this proceeding, the Bank and Continental Finance marketed CFC Cards by Internet solicitations and by sending consumers direct mail solicitation letters.

89.    A typical and illustrative Internet solicitation and direct mail solicitation marketed the CFC Cards as having low annual fees, free online account access and tools, and frequent credit limit increases.  In different versions of the solicitations, one or more of the initial fees were not disclosed or were inadequately disclosed.

90.    The Internet solicitation and direct mail solicitations failed to adequately

disclose that consumers would be immediately billed the $99 account set-up fee, $89 program participation fee, and the $27 or $49 annual fee depending on the credit card selected, and the $10 monthly maintenance fee.

91.    A typical and illustrative Internet solicitation and direct mail solicitation manipulated the words used or omitted words, the placement and size of the text, and the overall arrangement of the Internet solicitation and direct mail solicitation to represent, expressly or by implication, that consumers who were approved would receive a credit card that had $300 in available credit.

92.    These Internet and direct mail solicitations, when viewed as a whole, were deceptive in nature because they failed to disclose, or disclosed inadequately, the actual available credit, the fees and costs of the CFC Cards, and the impact of the fees and costs on the available credit.

93.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that significant up-front fees would be charged to a consumer's account.

94.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that a consumer would be automatically charged $25 for each credit increase of $100, which could only occur twice a year, that the consumer could "opt out" of such credit increases, and that failure to "opt out" would result in the automatic imposition of the $25 fee for the $100 credit increase.

95.    These Internet and direct mail solicitations failed to disclose, or disclosed inadequately, that a consumer would have to pay $4 for making an account payment over the Internet.

96.    By reason of the acts and practices described in paragraphs 70 through

95, the Bank violated Section 5 as follows:

(a)    The Bank represented, expressly or by implication, that consumers would receive a CFC Card with $300 of available credit.  In fact, consumers who responded to the solicitations and opened an account received only $53 or $75 of available credit due to the significant fees billed immediately to their accounts. Therefore, the Bank's representations regarding the amount of credit that consumers would receive were false or misleading and a deceptive practice.

(b)    The Bank represented, expressly or by implication, that consumers would receive a credit card with $300 of available credit with a "low annual fee," "free online account access and tools," and "credit limit increases."  The Bank failed to disclose, or failed to disclose adequately, that consumers would be charged significant up-front fees, including an account set-up fee, annual fee, account opening fee, and a monthly maintenance fee.  The Bank also failed to disclose, or disclosed inadequately, the credit line increase fee, including the "opt out" procedures, and the online account payment fee.  In light of the representations made, the Bank's failure to disclose, or the failure to disclose adequately, the material information about the up-front fees that the consumer would be charged, and the failure to disclose, or failure to disclose adequately, the credit line increase fee of $25, including the "opt out" procedures, and the online account payment fee of $4 were deceptive practices.

97.    The actions alleged in paragraphs 70 through 96 above continued from at least March 2006 through, upon information and belief, to the present, and represent the Bank's violations of Section 5 related to the CFC Cards.

21

## VIOLATIONS OF OTHER LAWS AND REGULATIONS

### (as to the Bank only)

98.     The Bank has been operating in violation of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* (EFT Act) and Regulation E of the Board of Governors of the Federal Reserve, 12 C.F.R. Part 205 (Regulation E).  The EFT Act and Regulation E prohibit, among other things, the conditioning of an extension of credit to a consumer on the consumer's repayment by preauthorized recurring electronic funds transfers unless pursuant to an overdraft credit plan or to maintain a specified minimum balance in the consumer's account.  Creditors may offer a program with a reduced annual percentage rate or other cost-related incentive for an automatic electronic repayment feature, if the program requiring the automatic electronic repayment is not the only program offered for the type of credit involved.

99.     Two ILPs offered by the Bank, the Purpose ILP and the Check'n Go ILP, required repayment by electronic fund transfer on a preauthorized recurring basis in violation of the EFT Act and Regulation E.  The Internet website for the Purpose ILP, the primary source of applications for this ILP, identified preauthorized recurring electronic fund transfers as the sole means of repayment and no other options were disclosed.  The website for the Check'n Go ILP repeatedly advised applicants that they could borrow up to $1,500; however, this amount was only available to consumers repaying the loan by electronic fund transfer on a preauthorized recurring basis.  If a consumer elected to repay via a remotely created check they could only borrow up to $200.  This difference in the "up to" amount does not constitute the type of cost-related incentive contemplated by Regulation E.  The "up to" $1,500 Check'n Go ILP conditioned on repayment by

electronic fund transfer on a preauthorized recurring basis therefore violated the EFT Act and Regulation E.

100.    Part 332 of the FDIC's Rules and Regulations, 12 C.F.R. Part 332, implementing the consumer privacy safeguards of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.* (Part 332) prohibits financial institutions from disclosing any nonpublic, personal information about a consumer to nonaffiliated third parties unless, the consumer was provided a notice and an opportunity to opt-out and the consumer did not opt-out.

101.    The Little Rock Cards' online applications automatically authorized the Bank to forward the consumer's name and address to a third party.  The online application also allows the Bank to forward to third parties:  the application information, any credit report information, and any other information gathered and considered as part of the application for the Little Rock Cards.

102.    The Bank failed to provide the customer with an opt-out notice giving the customer the opportunity to opt-out of this sharing arrangement.  Additionally, the only way that the consumer could avoid sharing personal information was to not apply for the credit product.

103.    Part 332 also requires financial institutions to provide a clear and conspicuous initial notice that accurately reflects its privacy policies and practices to any individuals who become their customer.

104.    The Bank failed to ensure that customer information was protected from other parties.  Two other FDIC regulated institutions have contractual relationships with CompuCredit.  The computer system utilized by CompuCredit, the Bank, and the other

23

two institutions did not include proper firewalls to prohibit credit card staff from viewing the customer accounts at any of the three banks.

105.    By failing to provide their customers with an opportunity to opt-out of the information sharing, the required privacy notice, or a properly secure computer system for storing personal information, the Bank violated Part 332.

106.    The Bank has been operating in violation of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* (ECOA) and Regulation B of the Board of Governors of the Federal Reserve System,12 C.F.R. Part 202 *et seq.* (Regulation B).  ECOA and Regulation B prohibit creditors from discriminating against an application in any aspect of a credit transaction on the basis that the applicant, in good faith, exercised any right under the Consumer Credit Protection Act , 15 U.S.C. § 1501 *et seq.*

107.    The Bank had measures in place to automatically decline applicants for ILPs who had placed fraud or active duty alerts on their credit reports resulting in an automatic credit denial based upon an applicant's valid exercise of their rights under the Consumer Credit Protection Act and the violation of ECOA and Regulation B.

108.    The Bank has been operating in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* (FCRA).  FCRA requires, among other things, that a financial institution contact any consumer requesting a fraud or active duty alert be placed on their consumer report and specifying a telephone number to be used for identify verification purposes be contacted at that number before authorizing a new credit plan or extension of credit.

109.    The Bank's practice of requiring an applicant who placed a fraud or active duty alert on their consumer report to contact the Bank to continue the application

24

process rather than contacting the consumer at their specified telephone number violated FCRA.

110.    The Bank has been operating in violation of the E-Sign Act, 15 U.S.C. §§ 7001 *et seq*. (E-Sign Act) and Regulation Z of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 226 (Regulation Z). Regulation Z requires, among other things, that financial institutions comply with the E-Sign Act when providing required written disclosures to consumers by electronic communication. The E-Sign Act requires, among other things, that consumers consent to the receipt of disclosures electronically and that prior to providing such consent the consumer be provided notice that they have the right to receive the disclosure in a non-electronic format or on paper, the right to withdraw their consent to electronic communications and any conditions, consequences or fee for such withdrawal.

111.    The Bank's Imagine MasterCard and its Purpose Prepaid MasterCard required consumers to agree to receive all communication electronically, including, but not limited to disclosures, periodic statements, amendments and collection efforts without providing the disclosures required by the E-Sign Act and Regulation Z resulting in violations of the E-Sign Act and Regulation Z.

112.    The Bank has been operating in violation of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. §§ 7701 *et seq*. The CAN-SPAM Act prohibits, among other things, the use of false or misleading header information in an electronic mail message (e-mail) such as a "from" line that does not accurately identify the initiator of the message, the use of deceptive subject headings and requires a clear and conspicuous identification that the e-mail

message is an advertisement or solicitation.

113.    The Bank's e-mail solicitations for its Imagine MasterCard failed to comply with the CAN-SPAM Act in that the initiator of the message was not accurately identified, the subject line did not accurately reflect the purpose of the contact and the e-mail message did not indicate in a clear and conspicuous manner that it was a solicitation.

## UNSAFE OR UNSOUND PRACTICES

### (as to the Bank only)

114.    The FDIC Compliance Examiners examined the Bank and issued a Compliance Report and Community Reinvestment Act Performance Evaluation as of April 6, 2006 (Compliance Report).  The FDIC Risk Management Examiners subsequently examined the Bank and issued the April 25, 2007 Report of Examination (ROE) utilizing financial information as of March 31, 2007.

115.    Since at least 2005, the Bank has, through its National Consumer Products Division (NCP Division), engaged in lending programs offered, marketed, administered, processed, serviced and/or collected by third-parties pursuant to arrangements or agreements with the Bank including but not limited to those third party arrangements and agreements identified in Exhibit "A" attached hereto and incorporated herein by reference (all collectively referred to in this NOTICE as "third-party lending programs"; the third party providing one or more of these functions shall be referred to in this NOTICE as "third-party providers").

116.    The NCP Division's third-party lending programs include four third-party providers offering ILPs, two third-party providers offering subprime credit cards, a third-party provider offering an affinity credit card for financing dental expenditures, a third-

party provider offering an affinity credit card predicated on advancing a percent of the enrolled employee's annual wages, two third-party providers offering life insurance premium products and five third-party providers offering stored value cards.

117.    The ROE reflects that as of March 31, 2007, the aggregate dollar volume of the NCP Division's outstanding loans and unfunded commitments are $287.8 million, ten times the Bank's capital.  As of September 30, 2007, the aggregate dollar volume the NCP Division's outstanding loans and unfunded commitments had increased to $667.3 million, twenty-one times the Bank's capital.

118.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division without effective oversight by the Bank's board of directors (Board) and without adequate supervision by the Bank's senior management of the NCP Division's third-party lending programs and third-party providers it utilizes.  The inadequacies of Board's oversight and senior management's supervision include, but are not limited to, the following:

(a)    Despite the regulatory concerns expressed in four consecutive examinations of the Bank, the Board and senior management continue to allow the NCP Division to operate without adequate policies and procedures, without an adequate internal audit program, without an adequate management information system, without adequate internal controls and without fully implementing commitments made to the FDIC for remediation of previously identified deficiencies and to continue to expand existing third-party lending programs and to offer new third-party lending programs with new and existing third-party providers that do not conform with regulatory pronouncements and consumer protection laws and regulations;

27

(b)    Board meeting minutes and packages do not reflect satisfactory review, due diligence, risk assessment and consideration of compliance issues prior to the initiation of new third-party programs and/or regular review, due diligence, risk assessment and consideration of compliance issues once a new third-party program is launched;

(c)    The risk management program established by Board and senior management is fragmented and ineffective.  The Board and senior management have not established clear lines of responsibility and accountability for detailed due diligence, risk assessment and compliance with consumer protection laws and regulations of each third-party lending program and third-party provider prior to the initiation of new third-party lending programs, for regular detailed due diligence, risk assessment and compliance with consumer protection laws and regulations of each third-party lending program and third-party provider once a third-party lending program is launched or for an overall risk assessment of the NCP Division;

(d)    The infrastructure of the risk management program established by the Board and senior management for the NCP Division is insufficient in light of the rapid expansion of the NCP Division, the complexity of its operations and the risk inherent with each third-party provider and each third-party lending program;

(e)    Capital planning by the Board and senior management does not restrict or limit aggregate third-party lending programs in relation to capital or satisfactorily address or plan for the impact on capital the rapid growth of the NCP Division's third-party lending programs may have; and

(f)    The Board and senior management have not retained a sufficient

28

number of appropriately trained staff for the NCP Division.

119.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate system of internal controls with regard to the size of the NCP Division and the nature, scope and risk of the third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contacted in Appendix A to Part 362, 12 C.F.R. Part 364.  The inadequacies of the Bank's internal controls include, but are not limited to, the following:

(a)    The NCP Division's organizational structure and reporting lines do not establish clear lines of authority and responsibility for:  (i) oversight of each third-party lending program and each third-party provider; (ii) assessing and monitoring each third-party lending program and each third-party provider for compliance with all applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance, statements of policies as well as all applicable policies and procedures of the Bank; or (iii) reporting the results of such assessments and monitoring activity to the Board;

(b)    The NCP Division's risk assessment process is ineffective in identifying, assessing, managing, controlling and reporting to the Board and senior management the strategic, legal, reputational, operational, transactional, compliance, regulatory, accounting and credit risk associated with each third-party lending program and each third-party provider; and

(c)    The NCP Division has not retained a sufficient number of appropriately trained staff to perform satisfactory risk assessment and monitoring of its third-party lending programs and third-party providers.

29

120.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate management information system (MIS) with regard to the size of the NCP Division and the nature, scope and risks of third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contained in Appendix A to Part 364, 12 C.F.R. Part 364. The inadequacies of the MIS include, but are not limited to the following:

(a)    The MIS does not collect, analyze or retain information necessary to allow the Bank to ascertain whether a lending transaction represents a fair exchange of value for the borrower, whether the pricing of the loan appropriately reflects the borrower's risk of repayment, whether the pricing is customary and reasonable under the circumstances and therefore whether the Bank is in compliance with the guidance set forth in the *FDIC's Supervisory Policy on Predatory Lending*, FIL-6-2007 (January 22, 2007);

(b)    The MIS does not collect, analyze or retain information necessary to appropriately monitor each third-party lending program or each third-party provider;

(c)    The MIS does not collect, analyze or retain information necessary to conduct trend analysis of each third-party lending program or each third-party provider for performance, utilization or delinquencies and charge-offs;

(d)    The MIS does not collect, analyze or retain information necessary to appropriately monitor each third-party lending program or each third-party provider for compliance with all federal consumer protection laws and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank; and

(e)    The NCP Division has not retained a sufficient number of

appropriately trained MIS staff.

121.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate internal audit system with regard to the size of the NCP Division and the nature, scope and risks of the third-party lending programs and third-party providers in contravention of the Standards for Safety and Soundness contained in Appendix A to Part 364, 12 C.F.R. Part 364. The inadequacies of the Bank's internal audit system include, but are not limited to the following:

(a)    Insufficient internal audit staffing levels;

(b)    Lack of specific internal audit plans for each third-party lending program and third-party provider that ensure that the scope and testing are adequate to (i) detect substantive deficiencies in the operation of the lending program (including reconcilement and settlement procedures); (ii) determine the lending program's level of compliance with all applicable federal consumer protection laws and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank; and (iv) determine the financial condition of each third-party provider and its ability to meet its financial obligations and commitments to the Bank;

(c)    An insufficient internal audit schedule;

(d)    Audit reports which are not comprehensive and do not reflect reviews and comments on third-party lending programs and third-party providers;

(e)    The Compliance Self Assessment Program, adopted in 2006, is not customized to address each third-party lending program and third-party provider; and

31

(f)    Audit Committee meetings are structured to allow inside directors and senior management to attend and participate in every meeting.

122.    The Bank has engaged in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate compliance management system to ensure compliance with all federal consumer protection laws, including, but not limited to Section 5, and all implementing rules and regulations, regulatory guidance and statements of policy as well as all applicable policies and procedures of the Bank. The inadequacies of the Bank's compliance management system include, but are not limited to, the following:

(a)    Policies and procedures with respect to third-party lending programs and third-party providers do not satisfactorily provide for oversight, monitoring and auditing, including, but not limited to, initial and periodic review of solicitation materials, disclosures and/or advertisements, monitoring and auditing the third-party providers' collection, customer service and telemarketing centers;

(b)    Failure to fully implement the audit procedures and compliance consultant services of the Bank's Compliance Management Policy;

(c)    Failure to periodically review and enhance the Bank's Compliance Management Policy to satisfactorily address new third-party lending programs and third-party providers;

(d)    The NCP Division has not retained a sufficient number of appropriately trained compliance staff; and

(e)    The NCP Division has not satisfactorily trained existing compliance staff with respect to applicable federal consumer protection laws, including,

but not limited to, Section 5, and all implementing rules and regulations, regulatory guidance and statements of policy, applicable policies and procedures of the Bank and its third-party lending programs and third-party providers.

123.     The Bank engaged in unsafe and/or unsound banking practices by operating without policies, practices, or systems that comply with the following policies and guidelines:

(a)     *Account Management and Loss Allowance Guidance for Credit Card Lending*, FIL-2-2003 (January 8, 2003);

(b)     *Uniform Retail Credit Classification and Account Management Policy*, FIL-40-2000 (June 29, 2000);

(c)     *Interagency Statement on the Purchase and Risk Management of Life Insurance*, FIL-127-2004 (December 7, 2004);

(d)     *Overdraft Protection Programs Joint Agency Guidance*, FIL-11-2005 (February 18, 2005); and

(e)     *Unfair or Deceptive Acts or Practices by State-Chartered Banks,* FIL-26-2004 (March 11, 2004).

124.     Each of the unfair or deceptive acts and practices described in paragraphs 9 through 97 above are also unsafe and/or unsound banking practices within the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

125.     Each of the violations of law, rules, or regulations described in paragraphs 98 through 123 above are also unsafe and/or unsound banking practices within the meaning of section 8(b)(1) of the FDI Act, 12 U.S.C. § 1818(b)(1).

126.     By reason of the violations of law and the unsafe and/or unsound

banking practices alleged in paragraphs 9 through 123 above, especially the violations of

Section 5, the Bank engaged in and is currently engaging in unsafe and/or unsound

banking practices by failing to provide effective oversight and supervision of its third

party service providers.

## **RESTITUTION**

### **(as to the Bank and CompuCredit)**

127.    Each of the unfair or deceptive acts and practices described in

paragraphs 9 through 56 above resulted in unjust enrichment to the Bank and

CompuCredit within the meaning of 12 U.S.C. § 1818(b)(6).

128.    Each of the unfair or deceptive acts and practices described in

paragraphs 9 through 56 above involved a reckless disregard for the law within the

meaning of 12 U.S.C. § 1818(b)(6).

129.    As a result of the conduct described in paragraphs 9 through 56 above,

consumers were aggrieved in an amount not presently ascertainable, but likely to exceed

$35 million.

## **RESTITUTION**

### **(as to the Bank)**

130.    Each of the unfair or deceptive acts and practices described in paragraphs

70  through 97 above,  resulted in unjust enrichment to the Bank within the meaning of

12 U.S.C. § 1818(b)(6).

131.    Each of the unfair or deceptive acts and practices described in paragraphs

70 through 97 above, involved a reckless disregard for the law within the meaning of 12

U.S.C. § 1818(b)(6).

132.    As a result of the conduct described in paragraphs 70 through 97 above, for all CFC Card consumer accounts that were opened from inception of the CFC Card program and continuing through the present, the Bank shall provide restitution to aggrieved consumers in an amount not presently ascertainable, but shall include in the form of reimbursement the following fees, charges and costs:  (a) initial account set-up fee of $99; (b) program participation fee of $89; (c) first account annual fee charged of $49 or $27 depending on the type of account;  (d) all monthly maintenance fees in the amount of $10 charged within the first twelve billing cycles of the account; (e) first two credit increase charges billed in the amount of $50; and (f) all fees charged within the first twelve billing cycles of the account for Internet transactions executed by the consumer.

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO PAY; AND NOTICE OF HEARING

133.    The FDIC incorporates the allegations of paragraphs 1 through 132 as FINDINGS OF FACT AND CONCLUSIONS OF LAW for purposes of this NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES (NOTICE OF ASSESSMENT) as though fully set out herein.

## ORDER TO PAY – FIRST BANK OF DELAWARE

134.    By reason of the violations of law set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).  After taking into account the appropriateness of the penalties with respect to the size of the financial resources and good faith of the Bank, the gravity of the violations, the history of

previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF

ASSESSMENT, a penalty of Three Hundred and Four Thousand Dollars ($304,000) be,

and hereby is, assessed against the Bank pursuant to section 8(i)(2) of the FDI Act, 12

U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and

hereby is, stayed with respect to the Bank until 20 days after the date of service of the

NOTICE OF ASSESSMENT on the Bank, during which time the Bank may file an

answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12 U.S.C. §

1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and Procedure, 12

C.F.R. § 308.19.

135.    The Bank must specifically request a hearing within 20 days of service of

the NOTICE OF ASSESSMENT on the Bank pursuant to section 8(i)(2)(H) of the FDI

Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and

Procedure, 12 C.F.R. § 308.19.  If the Bank fails to request a hearing within 20 days of

service of this NOTICE OF ASSESSMENT, the penalty assessed against the Bank

pursuant to the ORDER TO PAY will be final and unappealable and shall be paid within

60 days after the date of service of this NOTICE OF ASSESSMENT on the Bank.

136.    In the event the Bank requests a hearing, the Bank shall also file an answer

to the charges in the NOTICE OF ASSESSMENT within 20 days of service of the

NOTICE OF ASSESSMENT on the Bank in accordance with section 308.19 of the

FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## ORDER TO PAY – COMPUCREDIT

137.    By reason of the violations of law set forth in the NOTICE OF

ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed

against CompuCredit pursuant to section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).

After taking into account the appropriateness of the penalties with respect to the size of

the financial resources and good faith of CompuCredit, the gravity of the violations, the

history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of the violations set forth in the NOTICE OF

ASSESSMENT, a penalty of Eight Hundred and Six Thousand Dollars ($806,000) be,

and hereby is, assessed against CompuCredit pursuant to section 8(i)(2) of the FDI Act,

12 U.S.C. § 1818(i)(2);

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and

hereby is, stayed with respect to CompuCredit until 20 days after the date of service of

the NOTICE OF ASSESSMENT on CompuCredit, during which time CompuCredit may

file an answer and request a hearing pursuant to section 8(i)(2)(H) of the FDI Act, 12

U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of Practice and

Procedure, 12 C.F.R. § 308.19.

138.    CompuCredit must specifically request a hearing within 20 days of service

of the NOTICE OF ASSESSMENT on CompuCredit, pursuant to section 8(i)(2)(H) of

the FDI Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC's Rules of

Practice and Procedure, 12 C.F.R. § 308.19.  If CompuCredit fails to request a hearing

within 20 days of service of this NOTICE OF ASSESSMENT, the penalty assessed

against CompuCredit pursuant to the ORDER TO PAY will be final and unappealable

and shall be paid within 60 days after the date of service of this NOTICE OF

ASSESSMENT on CompuCredit.

139.    In the event CompuCredit requests a hearing, CompuCredit shall also file

an answer to the charges in the NOTICE OF ASSESSMENT within 20 days of service of

the NOTICE OF ASSESSMENT on CompuCredit, in accordance with section 308.19 of

the FDIC's Rules of Practice and Procedure, 12 C.F.R. § 308.19.

## NOTICE OF HEARING

140.    Notice is hereby given that a hearing will be held in Wilmington,

Delaware, commencing 60 days from the date of service of the NOTICE OF CHARGES

FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION, or on such

date and at such place as may be set by the Administrative Law Judge appointed to hear

the matter, for the purpose of taking evidence on the charges specified in the NOTICE

OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR

RESTITUTION and to determine whether an appropriate order should be issued under

the FDI Act requiring the Bank and CompuCredit to:

(a)    cease and desist from the unsafe or unsound banking practices and

violations of law specified therein; and

(b)    take affirmative action to correct the conditions resulting from

such practices and violations, including making restitution and/or providing

reimbursement to affected consumers.

141.    If the Bank or CompuCredit requests a hearing with respect to the charges

specified in the NOTICE OF ASSESSMENT, evidence shall also be taken on the charges

specified therein at the same time and place for the purpose of determining whether the

Bank shall be ordered to forfeit and pay a civil money penalty in accordance with section 8(i)(2) of the FDI Act, 12 U.S.C. § 1818(i)(2).

142.    The hearing will be held before an Administrative Law Judge to be appointed by the Office of Financial Institution Adjudication pursuant to 5 U.S.C. § 3105. The hearing will be public, and in all respects will be conducted in compliance with the FDI Act, the Administrative Procedures Act, 5 U.S.C. §§ 551 - 559, and the FDIC's Rules of Practice and Procedure, 12 C.F.R. Part 308.

143.    The Bank and CompuCredit are each directed to file an answer to the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION within 20 days from the date of service on the Bank or CompuCredit, as provided in 12 C.F.R. § 308.19 of the FDIC Rules of Practice and Procedure.

144.    The original and one copy of all papers filed or served in this proceeding shall be filed with the Office of Financial Institution Adjudication, 1700 G Street, N.W., Washington, D.C. 20552, pursuant to section 308.10 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.10. Copies of all papers filed or served in this proceeding shall be served upon Robert Feldman, Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (F-1058), Washington, D.C. 20429-9990; A.T. Dill III, Senior Counsel, Enforcement Unit, Legal Division, Federal Deposit Insurance Corporation, 550 17th Street, N.W. (MB-3124), Washington, D.C. 20429-9990; and Stephen L. Rodgers, Acting Regional Counsel (Supervision), Federal Deposit Insurance Corporation, 20 Exchange Place, New York, New York 10005.

Pursuant to delegated authority.

Dated this 10th day of June, 2008.

Sandra L. Thompson
Director
Division of Supervision and Consumer Protection

# EXHIBIT A

1. Amended and Restated Affinity Card Agreement dated as of March 13, 2006 between CompuCredit Corporation and First Bank of Delaware;

2. Amended and Restated Installment Loan Marketing and Servicing Agreement dated as of September 20, 2006 (made effective as of August 23, 2006) between Noble Consumer Lending Services, LLC and First Bank of Delaware;

3. Credit Card Marketing and Servicing Agreement dated as of August 31,2005 between First Bank of Delaware and CARDS Credit Services, LLC;

4. Credit Card Marketing Agreement dated as of February 28, 2006 by and among Continental Finance Company, LLC, Continental Sub-Prime Purchasing, LLC and First Bank of Delaware, and the Amended and Restated Receivables Purchase Agreement dated as of May 17, 2006 by and among First Bank of Delaware, Continental Finance Company, LLC, and Continental Sub-Prime Purchasing, LLC;

5. Credit Card Marketing Agreement dated as of January 18, 2007 between Accucredit Associates, LLC and First Bank of Delaware and the Receivables Purchase Agreement dated January 17, 2007 between Accucredit Associates, LLC and First Bank of Delaware;

6. Credit Card Marketing Agreement dated as of September 29, 2006 between E-Duction, Inc. and First Bank of Delaware and the Receivables Purchase Agreement dated September 29, 2006 between First Bank of Delaware and E-Duction Receivables Funding I, LLC;

7. Installment Loan Marketing and Servicing Agreement dated as of November 1, 2006 between Avante Teladvance, Inc. d/b/a Check 'n Go Online and First Bank of Delaware;

8. Consumer Loan Marketing, Origination, and Sale Agreement dated as of January 15, 2007 between CashCall, Inc. and First Bank of Delaware;

9. Marketing and Servicing Agreement dated as of January 23, 2007 between TC Loan Service, LLC d/b/a ThinkCash and First Bank of Delaware and the Master Participation Agreement dated as of January 23, 2007 between TC Financial, LLC and First Bank of Delaware;

10. Program Administration Agreement dated as of November 1, 2006, between First Bank of Delaware and Fortris Financial, LLC and PF Participation Funding Trust; Master Participation Agreement dated as of November 1, 2006 between First Bank of Delaware and Fortris Financial, LLC and PF

Participation Funding Trust; and the Sub-Servicing Agreement dated as of November 1, 2006 between Fortris Financial, LLC and First Bank of Delaware;

11. Premium Finance Program Agreement dated as of August 23, 2006 between First Delaware Services LLC and First Bank of Delaware;

12. Processor Sponsorship and Services Agreement dated as of April 17, 2006 between Card Express, Inc. and First Bank of Delaware;

13. Processor Sponsorship and Services Agreement dated as of August 26, 2005 between TSYS Prepaid, Inc. and First Bank of Delaware;

14. Processor Sponsorship and Services Agreement dated as of April 5, 2006 between ECOM Financial Corp. and First Bank of Delaware;

15. Program Management Agreement dated July 30, 2004 between Financial Services International, Inc. and First Bank of Delaware;

16. Processor Servicing Agreement dated as of October 5, 2004 between Lynk Systems, Inc. and First Bank of Delaware.

# EXHIBIT B

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

|  |  |  |
|---|---|---|
| In the Matter of | ) | TEMPORARY ORDER TO |
|  | ) | CEASE AND DESIST |
| FIRST BANK OF DELAWARE | ) |  |
| WILMINGTON, DELAWARE | ) | FDIC-08-151c&b |
|  | ) | FDIC-07-256b |
|  | ) |  |
| (Insured State Nonmember Bank) | ) |  |
|  | ) |  |

The Federal Deposit Insurance Corporation (FDIC) has determined that the unsafe or unsound banking practices involving subprime lending that the First Bank of Delaware, Wilmington, Delaware (Bank), is alleged to have engaged in or that the FDIC has reason to believe the Bank is about to engage in, as specified in the NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; ORDER TO PAY; AND NOTICE OF HEARING (collectively, NOTICE), issued on June 10, 2008, attached hereto and incorporated herein by reference, and/or the continuation thereof by the Bank, are likely to cause insolvency or significant dissipation of the assets or earnings of the Bank, or are likely to weaken the condition of the Bank or otherwise prejudice the interests of the depositors of the Bank prior to the completion of the proceedings against the Bank conducted pursuant to section 8(b) of the Federal Deposit Insurance Act (Act), 12 U.S.C. § 1818(b).

In particular, the FDIC has determined that the Bank's imminent intention to acquire one or more portfolios of credit card accounts, given the unsafe and unsound practices evidenced in its subprime lending, including ineffective oversight of third-party vendors, is likely to weaken the condition of the Bank.

Therefore, the FDIC hereby issues this TEMPORARY ORDER TO CEASE AND DESIST (TEMPORARY ORDER) and hereby gives notice pursuant to section 8(c)(1) of the Act, 12 U.S.C. §1818(c)(1), that the Bank and its institution-affiliated parties, successors and assigns, be and hereby are ORDERED to cease and desist from and take affirmative action as follows:

1.    The Bank shall not acquire any portfolios of consumer credit card accounts from Columbus Bank and Trust Company, Columbus, Georgia; CompuCredit Corporation, Atlanta, Georgia, or any other insured depository institution or other entity until such time as:

    (a) the Bank submits to the Regional Director of the FDIC's New York Regional Office (Regional Director) for non-objection, an operating and capital plan that:

        (i) assesses all risks associated with the credit card accounts to be acquired;

        (ii) addresses the unsafe or unsound banking practices involving subprime lending that the Bank is alleged to have engaged in as specified in the Notice, including but not limited to, ineffective oversight by the Bank's board of directors and the lack of adequate supervision by the Bank's senior management, inadequate Bank policies and procedures, inadequate internal controls and audit system, inadequate and inappropriately trained number of staff, inadequate management information system, and an inadequate compliance management system, as more fully set forth in paragraphs 114 – 122 of the NOTICE;

        (iii) mitigates all risks identified by the plan, including but not limited to, funding risk, by identifying satisfactory sources of additional capital to meet

the Bank's current and future needs resulting from the subprime credit card

accounts to be acquired, and the sources of said capital, including a

contingency plan that identifies alternative sources should the primary

sources of capital be unavailable;

(iv) complies with the *Interagency Expanded Guidance for Subprime*

*Lending Programs*, FIL-9-2001 (January 31, 2001); and

(b)  the Regional Director has provided the Bank with written notice of her non-

objection to such plan.

This TEMPORARY ORDER shall be effective immediately upon service on the Bank and

shall remain in full force and effect, pending the completion of the administrative proceedings

instituted pursuant to the foregoing NOTICE.


Pursuant to delegated authority.

Dated this 3rd day of July 2008.

_____
Christopher J. Spoth
Senior Deputy Director
Division of Supervision and Consumer Protection

# EXHIBIT C

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |
| FIRST BANK OF DELAWARE<br>WILMINGTON, DELAWARE<br>(Insured State Nonmember Bank) | FDIC-08-151c&b<br>FDIC-07-256b |

The Federal Deposit Insurance Corporation (FDIC), has considered whether to issue a

TEMPORARY ORDER TO CEASE AND DESIST (TEMPORARY ORDER), pursuant to

section 8(c) of the Federal Deposit Insurance Act (Act), 12 U.S.C. §1818(c), in conjunction with

the issuance of a NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND

FOR RESTITUTION; ORDER TO PAY; AND NOTICE OF HEARING (collectively,

NOTICE), pursuant to section 8(b)(1) of the Act, 12 U.S.C. §1818(b)(1), against First Bank of

Delaware, Wilmington, Delaware (Bank).

Based upon information provided by the Bank and/or discovered through a currently

ongoing FDIC examination, FDIC examinations conducted April 25, 2007 and April 6, 2006,

and other information, the FDIC makes the following FINDINGS OF FACT AND

CONCLUSIONS OF LAW:

### Jurisdiction and Background

1.    The Bank is a corporation organized, existing, and doing business under the laws

of the State of Delaware with its principal place of business in Wilmington, Delaware.

2.    The Bank is, and at all times relevant to this proceeding has been, a "State

nonmember bank" within the meaning of section 3(e)(2) of the Act, 12 U.S.C. § 1813(e)(2); an

"insured depository institution" within the meaning of section 3(c)(2) of the Act, 12 U.S.C. §

1

1813(c)(2); and subject to the Act, 12 U.S.C. §§ 1811-1831aa, the FDIC's Rules and

Regulations, 12 C.F.R. Chapter III, and the laws of the State of Delaware.

3.      The FDIC is the "appropriate Federal banking agency", as that term is defined in

section 3(q)(3) of the Act, 12 U.S.C. § 1813(q)(3), with respect to the Bank, and has jurisdiction

over the Bank and the subject matter of this proceeding.

4.      CompuCredit Corporation (CompuCredit) is a corporation organized, existing,

and doing business under the laws of the State of Georgia, and has its principal place of business

in Atlanta, Georgia.

5.      Since at least 2005, the Bank has, through its National Consumer Products

Division (NCP Division), engaged in lending programs offered, marketed, administered,

processed, serviced and/or collected by CompuCredit and other third parties pursuant to

arrangements or agreements with the Bank.

6.      The FDIC examination of the Bank conducted April 25, 2007, determined that the

NCP Division's third-party lending programs include, among other things, four third-party

providers offering installment loan programs (ILPs), two third-party providers offering subprime

credit cards, a third-party provider offering an affinity credit card for financing dental

expenditures, a third-party provider offering an affinity credit card predicated on advancing a

percent of the enrolled employee's annual wages, two third-party providers offering life

insurance premium products, and five third-party providers offering stored value cards.

### Subprime Credit Card Lending

7.      Since at least February 2005, pursuant to a contractual arrangement, the Bank and

CompuCredit have engaged in credit card lending activities throughout the United States targeted

at, among others, consumers who have inadequate or poor credit histories and, consequently,

have limited credit options (hereinafter, subprime credit card lending).

2

8.      Beginning February 16, 2005, the Bank and CompuCredit first entered into an agreement providing for, among other things, the marketing and issuance of credit cards. Subsequently, the agreement was amended and/or restated (collectively hereinafter, CompuCredit Affinity Agreements).

9.      Pursuant to the CompuCredit Affinity Agreements, the Bank issues the credit cards and owns the credit card accounts. CompuCredit markets the credit cards and services the accounts on behalf of the Bank. CompuCredit also purchases the credit card receivables from the Bank on a daily basis, and pays the Bank a monthly fee based upon the number of account statements processed.

10.     Since at least 2005, the Bank and CompuCredit have marketed credit cards throughout the United States under certain brand names including Tribute MasterCard, Imagine MasterCard, Purpose Advantage Credit Card and the Embrace Visa Card (collectively, CompuCredit Cards). The Tribute and Imagine MasterCards are referred to internally by the Bank and CompuCredit as the Little Rock cards (Little Rock Cards).

11.     CompuCredit also issues the Little Rock Cards through other FDIC supervised insured depository institutions, including Columbus Bank and Trust Company, Columbus, Georgia (CBT). CompuCredit has an affinity agreement with CBT that is similar to the affinity agreement with the Bank.

12.     In addition to subprime credit card products offered through CompuCredit, the Bank offers, among other financial products, additional credit card products through the arrangments listed in paragraph 6 and otherwise.

13.     As of March 31, 2007, the aggregate dollar volume of the NCP Division's outstanding loans were $287.8 million, ten times the Bank's capital. As of December 31, 2007, the aggregate dollar volume had increased to $748.5 million. As of March 31, 2008, the

3

aggregate dollar volume was $682 million.

14.    The most recent FDIC examination of the Bank commenced on June 23, 2008 (hereinafter, current FDIC examination).

15.    As of March 31, 2008:

    (a)    the Bank's total deposits equal $ 76 million;

    (b)    the Bank's "Tier 1 or Core Capital", as defined in section 325.2(v) of the Rules (Tier 1 capital), equals $36 million;

16.    As of May 31, 2008, CompuCredit has a reserve account at the Bank in the amount of $12,000,000 to cover contingency funding of consumer credit card receivables associated with the CompuCredit Cards, in the event CompuCredit fails to purchase and fund the credit card receivables.

17.    Prior to May 31, 2008, CompuCredit had a $2,000,000 reserve account at the Bank and provided the Bank a letter of credit to cover contingency funding of consumer credit card receivables associated with the CompuCredit Cards, in the event CompuCredit failed to purchase and fund the credit card receivables. The letter of credit expired on May 31, 2008 and was replaced with a cash reserve specified in paragraph 16 above.

### Unsafe or Unsound Practices

18.    Section 39 of the Act, 12 U.S.C. §1831p-1, requires the Federal banking agencies to establish certain safety and soundness standards for all insured depository institutions. Section 39(a) of the Act requires the FDIC to establish operational and managerial standards for its banks.

19.    The Interagency Guidelines Establishing Standards for Safety and Soundness, set forth at Appendix A to Part 364 of the FDIC's Rules and Regulations, 12 C.F.R. §364, Appendix A (Safety and Soundness Guidelines), were established under Section 39(a) of the Act to provide

4

guidance on safe and sound operational and managerial standards including, internal controls and information systems, internal audit systems, loan documentation, credit underwriting, asset growth, and asset quality.

20.    The Bank has failed to comply with the Safety and Soundness Guidelines and has failed to operate in a safe and sound manner, as detailed below, demonstrated principally by the Bank's continuing failure to adequately oversee and monitor its third-party lending programs.

21.    FDIC compliance examiners previously examined the Bank and issued a Compliance Report and Community Reinvestment Act Performance Evaluation as of April 6, 2006 (Compliance Report).  FDIC risk management examiners also examined the Bank and issued the April 25, 2007 Report of Examination (ROE) utilizing financial information as of March 31, 2007.  Both the Compliance Report and ROE cited the Bank for numerous unsafe or unsound banking practices and violations of law with respect to the Bank's third-party lending programs.

22.    The Bank is engaging in unsafe and unsound banking practices in that the Bank has been operating its NCP Division without effective oversight by the Bank's board of directors (Board) and without adequate supervision by the Bank's senior management of the NCP Division's third-party lending programs and third-party providers it utilizes.  The inadequacies of Board's oversight and senior management's supervision are detailed in the NOTICE, paragraph 118.

23.    The Bank is engaging in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate system of internal controls with regard to the size of the NCP Division and the nature, scope and risk of the third-party lending programs and third-party providers in contravention of the Safety and Soundness Guidelines.  The inadequacies of the Bank's internal controls are detailed in the NOTICE, paragraph 119.

24.    The Bank is engaging in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate management information system (MIS) with regard to the size of the NCP Division and the nature, scope and risks of third-party lending programs and third-party providers in contravention of the Safety and Soundness Guidelines. The inadequacies of the MIS are detailed in the NOTICE, paragraph 120.

25.    The Bank is engaging in unsafe and unsound banking practices in that the Bank has been operating its NCP Division with an inadequate compliance management system to ensure compliance with all federal consumer protection laws, including, but not limited to section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (Section 5), and all implementing rules and regulations, as well as all applicable policies and procedures of the Bank. The inadequacies of the Bank's compliance management system are detailed in the NOTICE, paragraph 122.

26.    The Bank is engaging in unsafe and/or unsound banking practices by operating without policies, practices, or systems that comply with the policies and guidelines listed in the NOTICE, paragraph 123.

27.    The Bank is continuing to engage in unsafe and/or unsound banking practices enumerated in the Notice and in paragraphs 20-26 above, and remains in substantial nonconformance with the Safety and Soundness Guidelines, especially with respect to the Bank's subprime credit card lending programs.

28.    The *Interagency Expanded Guidance for Subprime Lending Programs*, FIL-9-2001 (Jan. 31, 2001) (Subprime Guidance) states that banks are to recognize the additional risks inherent in subprime lending and to determine if those risks are controllable given the bank's staff, financial condition, size, and level of capital support. The FDIC considers subprime lending to be a high-risk activity that is unsafe or unsound if the risks associated with this

6

activity are not properly managed and controlled. The Bank's subprime credit card lending

policies and practices are unsafe and/or unsound in that they fail to properly manage and control

risk.

29.    The FDIC's *Guidance for Managing Third-Party Risk*, FIL-44-2008 (June 6,

2008) confirms that banks are responsible for actions taken on their behalf by third parties and

that, therefore, banks should assess and address the risks posed by the use of such third parties.

## Proposed Acquisition of Additional Subprime
## Credit Card Accounts Poses Increased Risks

30.    On or about May 15, 2008, CompuCredit issued a demand to CBT, under the

terms of its affinity agreement with CBT, to repurchase or transfer certain credit card accounts

owned by CBT, but serviced by CompuCredit. CompuCredit subsequently directed CBT to

transfer to the Bank 392,283 Little Rock Card accounts with a total outstanding balance due of

approximately $219,678,886 and total aggregate available credit of approximately $21,000,000.

31.    On June 9, 2008, the FDIC issued a stipulated Order to Cease and Desist and

Order to Pay (C&D Order) and an Order for Restitution against CBT. The C&D Order requires,

among other things, compliance with the *Interagency Account Management and Loss Allowance

Guidance for Credit Card Lending*, FIL-2-2003 (January 8, 2003) (Account Management

Guidance).

32.    CBT filed a civil action against CompuCredit on June 11, 2008 for, among other

things, CompuCredit's alleged refusal to comply with the Account Management Guidance.

33.    On June 10, 2008, the FDIC issued the NOTICE and commenced two similar

administrative enforcement actions, one against CompuCredit alone (relating to CBT) and the

other against another FDIC-supervised institution and CompuCredit. The three NOTICES

allege, among other things, that certain subprime credit card products, including those that

CompuCredit seeks to transfer from CBT to the Bank, were marketed in violation of Section 5.

34.    The FDIC determined that the Bank intends to acquire approximately 392,283 subprime credit card accounts currently owned by CBT.

35.    The Bank is operating in contravention of the Safety and Soundness Guidelines, Part 364 of the FDIC's Rules and Regulations, 12 C.F.R. §364, Appendix A because the Bank's operational and managerial standards are not consistent with safe and sound banking practices, as evidenced by the numerous unsafe and unsound banking practices and hazardous subprime credit card lending practices cited in the Notice and in paragraphs 21-30 above.

36.    Given the inadequacies of the Bank's management and supervision of the Bank's third-party subprime credit card lending policies and practices, the Bank should not be permitted to acquire any portfolios of credit card accounts unless the conditions specified in the TEMPORARY ORDER are met.

37.    The Bank is also operating in contravention of the Safety and Soundness Guidelines relating to capital risk because the Bank has not assessed or accounted for the financial, operational, compliance, and reputational risks associated with its current credit card portfolio and the effect on those risks posed by acquiring approximately 392,283 subprime credit card accounts.

38.    Given the Bank's failure to assess and account for the risks set forth in the Safety and Soundness Guidelines, the Bank should not be permitted to acquire any additional portfolios of credit card accounts unless the conditions specified in the TEMPORARY ORDER are met.

39.    In sum, the Bank is currently operating in an unsafe and/or unsound manner, without adequate systems and controls, and has failed to assess the risks associated with its currently held subprime credit card accounts. The Bank intends to acquire a large portfolio of additional subprime credit card accounts that are related to the FDIC's assertions of Section 5

8

violations, and has not assessed or accounted for the financial, operational, compliance, and reputational risks these additional accounts pose to the Bank, and does not have adequate oversight systems reasonable calculated to control these risks. Under these circumstances, the Bank should not be permitted to acquire additional portfolios of credit card accounts unless the conditions set forth in the TEMPORARY ORDER are met.

Based upon the foregoing, the FDIC is of the opinion that the Bank has engaged in unsafe or unsound banking practices in conducting the business of the Bank, and that unless restrained the Bank will continue to engage in such practices. The FDIC is further of the opinion that unless the Bank is restrained by the issuance of the TEMPORARY ORDER, such practices and violations, or their continuation, are likely to cause a significant dissipation of the Bank's assets or earnings, or are likely to weaken the condition of the Bank, or otherwise prejudice the interests of the Bank's depositors prior to the completion of the administrative proceedings instituted pursuant to the foregoing NOTICE.

WHEREFORE, the FDIC finds that, for the protection of the Bank and the interests of its depositors, it shall issue the TEMPORARY ORDER pursuant to section 8(c) of the Act, 12 U.S.C. § 1818(c), against the Bank.

Pursuant to delegated authority.

Dated this 3ʳᵈ day of July 2008.

Christopher J. Spoth
Senior Deputy Director
Division of Supervision and Consumer Protection

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| FIRST BANK OF DELAWARE, WILMINGTON, DELAWARE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 08-429 (GMS) |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF DOREEN R. EBERLEY

I, Doreen R. Eberley, do hereby aver that:

1.      I have been employed by the Federal Deposit Insurance Corporation (FDIC) for 21 years. I received a Bachelor of Arts degree from Cornell University and a Masters of Business Administration from Emory University.

2.      From March 1987 to March 1988, I was a Liquidation Technician in the FDIC's Division of Liquidation. From March 1988 to April 1991, I was an Assistant Examiner and from April 1991 to April 1994, I was a Commissioned Bank Examiner. Between April 1994 and March 1997, I was a Review Examiner, and from March 1997 until June 1998, I was a Case Manager. From June 1998 to August 1999, I was a Senior Case Manager, and from August 1999 until June 2001, I was the Assistant Regional Director in the Atlanta Regional Office. In June 2001, I was appointed Deputy Regional Director of the New York Regional Office. Currently, I am the Regional Director of the New York Region, Division of Supervision and Consumer Protection, and have held that position since January 2007. I have personal knowledge of the facts set forth in this Declaration.

3.    As the Regional Director of the FDIC's New York Region, I oversee the FDIC's

bank supervision and consumer protection activities in Maine, New Hampshire, Vermont,

Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey,

Delaware, Maryland, Washington, D.C., Puerto Rico and the U.S. Virgin Islands. I am

responsible for ensuring the safety and soundness of the FDIC supervised institutions in

the New York Region by identifying, monitoring and mitigating the various risks to

which these institutions are exposed.

4.    I have a thorough knowledge and understanding of the FDIC's rules and

regulations, financial institution letters, statements of policy and guidance, and banking

industry best practices.

5.    As Regional Director and Deputy Regional Director, I have overseen all five of

the FDIC's Safety and Soundness and Compliance examinations of the First Bank of

Delaware, Wilmington, Delaware (Bank) that occurred between 2004 and the present. I

have also met with Bank management on numerous occasions from 2004 through the

present and performed various other supervisory duties related to the Bank.

6.    The Bank does not operate as a typical community bank with a primary focus on

traditional lending products such as residential mortgages, business loans, etc. Instead,

the bulk of the Bank's business is contained in its National Consumer Products Division

(NCP Division), which houses approximately 15-20 lending products and programs of

which nearly all are operated by third parties who market, service, and buy back the loans

and receivables originated by the Bank.

7.    The NCP Division focuses primarily on high-risk, subprime credit products. The

NCP Division includes:  installment loan programs; dental expenditure credit cards; a

2

credit card that advances salary payments; life insurance premium financing, stored value cards; and subprime credit cards, including credit card accounts that are owned by the Bank, but offered, marketed, and serviced by CompuCredit Corporation, Atlanta, Georgia (CompuCredit).

8.    Banks have traditionally avoided lending to customers with poor credit histories because of the higher risk of default and resulting loan losses. However, the Bank primarily targets those customers with poor credit histories, referred to as "subprime" borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies and possibly more severe problems such as charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories. Loans to such borrowers have a higher risk of default than loans to prime borrowers.

9.    During the course of the previous examinations, the FDIC examiners cited significant deficiencies in Bank management's oversight of its NCP Division and the Bank's failure to adequately assess and mitigate the risks associated with its numerous third party lending programs including the subprime CompuCredit credit cards, which represent the Bank's single largest third party credit card program.

10.    Because the Bank sells most of the credit card receivables it originates on a daily basis, and because third parties are typically conducting most of the portfolio services, the risks may not appear as straightforward as they are with a conventional credit card lending model. However, the risks are considerable and must be properly mitigated. Risks associated with Rent-A-BIN arrangements, where banks originate and sell the

3

credit card receivables and receive a rental fee for the use of the bank's identification number include, but are not limited to: legal, compliance, and reputation risks; counterparty risk; funding risk; credit risk; and operational risk.

11.    Legal, compliance and reputation risks arise because a bank cannot effectively detach itself from the credit card activities since the bank's name remains as the card issuer and the bank remains contracted with the credit card Associations, e.g. Visa and Mastercard (Associations).  Thus, errors and violations of law or of cardholder agreements, by a bank, or its contracted parties, could expose the bank to substantial monetary loss through lawsuits, fines, or other financial burdens.  Consumer compliance risks, which can easily translate into safety and soundness risks, can be exacerbated when a third party's (or its agents') employees interact directly with the bank's customers.  For example, if the credit card marketing is determined to be unfair or deceptive, the bank may be held responsible for any monetary penalties, reimbursements, and any other actions (such as shutting down the program) necessary to promptly address the concerns.  As a result, risks to the bank's earnings and capital could ensue.  A bank's reputation can also suffer by association with improper or abusive business practices conducted by a third party or its agents.  A third party's decisions may affect a bank's ability to establish new relationships or continue existing relationships, which could impact a bank's strategic objectives.

12.    Counterparty risk, sometimes called default risk, is the risk that a third party will fail to perform its contractual obligations.  This risk is often closely tied to the performance of the credit card portfolio because the third party's earnings and thus, available capital reserves, are affected by the income generated by and costs associated

with the credit card program. The third party usually retains most of the program's income and carries most of the costs when it holds most or all of the receivables. The third party could fail to meet its obligations under the contract(s) governing the Rent-A-BIN arrangement. For example, the third party might fail to: buy the receivables from a bank; pay the Rent-A-Bin rental fee; comply with established financial requirements; or otherwise meet the terms of the agreement with a bank. As a result, a bank may have to fund or purchase the receivables, which affects the bank's liquidity and subjects the bank to credit and other risks. A bank might not be able to offset its oversight, management, or other costs for the program, which could stress the bank's earnings performance and, consequently, capital.

13.    Funding risk stems from a bank's responsibility to ensure that daily charges to the credit cards it issues are settled with the credit card Associations. Funding risk could be considered, in some respects, to be a by-product of counterparty risk. Usually a bank pays the credit card processor, whether or not that bank retains the receivables. Even if the contract requires the third party to pay the credit card processor, the bank, as the issuer of the credit card, is ultimately responsible to the credit card Associations for ensuring settlement is completed. Consequently, when third party funds, which are heavily influenced by cardholder payments, cannot fully meet settlement requirements, the bank is obligated to pay the difference.

14.    If a bank retains any credit card receivables, it is subject to credit risks. Credit risks also arise if receivables are held by a third party; however, those risks are not reflected on the bank's books. Credit risk could shift to the bank if the third party holding the receivables cannot fulfill its financial obligations, such as settlement. The

credit risks could be substantial if the bank has not properly controlled the third party's underwriting criteria and the third party solicited consumers with risky credit profiles, such as subprime consumers.

15.    Operational risk is generally defined as the risk of monetary loss resulting from inadequate or failed internal processes, people, and systems or from external events. Examples include fraud, business disruption, and poor execution of process management and can all have adverse impacts on a bank and its Rent-A-BIN credit card programs. Thoroughly investigating a product or program (due diligence procedures) and contingency planning can help limit the level of and impacts from operational risk.

16.    Poor planning, oversight, and control by bank management and inferior performance or service by the third party are usually the culprits that increase the risks listed above in paragraphs 11-15. Practices and safeguards that bank management commonly implements to mitigate the above risks include, but are not limited to, instituting policy controls, performing due diligence procedures, establishing a comprehensive contract between a bank and its third parties, and developing detailed contingency plans. Without proper safeguards in place, risk exposure could be substantial.

17.    Both the 2006 and 2007 examinations cited the Bank for its failure to develop an effective process to assess the risks of its third party lending activities, including its Rent-A-BIN arrangement with CompuCredit, and to ensure that appropriate procedures and controls were in place to adequately mitigate the credit risks associated with its subprime credit card lending.  The Bank also failed to implement a comprehensive monitoring program to oversee the third parties who were operating, marketing, and servicing the

subprime lending products.  Additionally, the Bank failed to assess and account for the capital risks inherent in subprime lending as described above.  It also failed to adequately address and mitigate the increasing risk levels associated with the rapid growth in its credit card lending activities.  The Bank's attempts to rectify these deficiencies have been incomplete, ineffective, or have not kept pace with the Bank's large and continually expanding NCP Division.

18.    Based on the serious deficiencies cited in the 2006 and 2007 examinations, I recommended that the FDIC issue a NOTICE OF CHARGES FOR AN ORDER TO CEASE AND DESIST AND FOR RESTITUTION; NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES; AND ORDER TO PAY (NOTICE), against the Bank.  On June 10, 2008, the FDIC issued the NOTICE against the Bank.

19.    The Bank is currently undergoing both Safety and Soundness and Compliance examinations (current FDIC examinations), which began on June 23, 2008.  The current FDIC examinations thus far indicate that the Bank continues to fail to comply with the Interagency Guidelines Establishing Standards for Safety and Soundness, set forth at 12 C.F.R. Pt. 364, App. A (Safety and Soundness Guidelines).  It is not operating in a safe and sound manner, which is demonstrated principally by the Bank's continuing failure to adequately oversee and monitor its third party lending partners by adopting an adequate system of internal controls and an adequate management information system.  Further, the Bank continues to operate with an inadequate compliance management system, which is needed to ensure compliance with all federal consumer protection laws including, but not limited to, section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (Section 5).  Additionally, the current FDIC examinations indicate that the Bank has not

assessed or accounted for the legal, compliance, and reputation risks; counterparty risk; funding risk; credit risk; and operational risk associated with its existing third party lending activities.

21.     The Bank's failure to operate in a safe and sound manner, failure to establish an adequate compliance management system, and failure to assess and account for the legal, compliance, and reputation risks; counterparty risk; funding risk; credit risk; and operational risk associated with its existing third party lending activities, gives rise to even greater concern at the current examinations, because the NCP Division's dollar volume of activity has grown significantly since the last examination, in both absolute terms and in relation to the Bank's capital reserves.

22.     As of March 31, 2008, the total outstanding balance for all NCP Division products was $682 million, compared to $287 million at March 31, 2007, which was the date of the financial data contained in the April 25, 2007 Safety and Soundness Report of Examination. This more than two-fold increase in the volume of business over four quarters demonstrates the rapid expansion of the NCP Division's third party lending activities. Further, the total balance of $682 million represents more than 18 times the Bank's current capital reserves whereas the total balance of $287 million outstanding at March 31, 2007, represented just over ten times the Bank's March 31, 2007 capital reserves.

23.     In addition to the total outstanding balance of NCP Division products listed above, as of March 31, 2008, there is another $204 million of credit that has been approved but not yet used by customers (available credit). This available credit is related

8

to the CompuCredit credit card accounts and represents the total balance available to customers for new charges.

24.     The Bank is exposed to counterparty, funding, and credit risks with respect to the available credit. As part of the agreement between the Bank and CompuCredit, CompuCredit purchases the credit card account receivables (receivables) for its products from the Bank on a daily basis. Receivables are created when customers make new charges against their available credit. The Bank relies on CompuCredit to purchase these receivables and could not fund the entire $204 million in available credit by itself if CompuCredit defaults. This reliance on CompuCredit to purchase the receivables creates the counterparty, funding, and credit risks. The Bank's review of CompuCredit's financial performance is a critical step required to assess CompuCredit's continuing ability to purchase new receivables, thereby limiting the Bank's counterparty, funding and credit risks.

25.     After a previous examination, the Bank indicated that it would obtain and analyze CompuCredit's financial performance as it relates to the Bank's credit card portfolio and affects the Bank's financial condition. The current FDIC examinations indicate that although some key financial performance reports are obtained monthly from CompuCredit, the Bank is merely summarizing the information and not utilizing the reports to perform even basic analysis relating to CompuCredit's trends in credit losses and delinquencies. Further, for the data that is available, there is no evidence that the Bank is implementing any appropriate changes in strategy from the information gathered.

26.     The current FDIC examinations indicate that the Bank also has not adequately addressed or analyzed, and does not have satisfactory strategies in place to deal with

9

scenarios in which CompuCredit or other third parties are unable or unwilling to purchase the subprime credit card receivables (contingency planning). This absence of adequate contingency planning is of grave concern given the recent deterioration in CompuCredit's financial performance.

27.     On May 7, 2008, CompuCredit filed its Form 10-Q (quarterly financial report) for the quarter ending March 31, 2008 with the Securities and Exchange Commission. The report indicated that CompuCredit was suffering from a weakened financial condition. The value of CompuCredit's credit card receivables are deteriorating due to economic factors, which increases the risk that CompuCredit will be unable to fulfill its obligation to purchase daily credit card receivables from the Bank. Further, CompuCredit's March 31, 2008 Form 10-Q also shows that its charge-off rates (*i.e.*, when a consumer fails to pay his or her account for 180 days and the account is written-off as worthless) are higher than at any time in the last eight quarters.

28.     In the event that CompuCredit cannot fulfill its obligation to purchase credit card receivables from the Bank, the Bank would be responsible for funding any future charges customers make on their credit cards. Based on the amount of credit available but not yet funded as of March 31, 2008, customers could make future charges of as much as $204 million. The Bank acknowledges that it cannot cover $204 million in credit card receivables, which is why it has a Contingency Funding Plan. Accordingly, in the event of a CompuCredit default, the Bank's Contingency Funding Plan is to terminate the credit card program by not allowing customers to make additional charges. The Bank has not provided the FDIC with documentation demonstrating that it could terminate the credit card program before customers have an opportunity to make substantial additional

charges against the $204 million in available credit.  Issues that have not been adequately

addressed by the Bank in this regard include variances in state law regarding the duration

of the notice period required prior to terminating available credit and expected consumer

behavior upon receipt of a notice indicating that available credit is about to be stripped

away.

29.     In the event of a CompuCredit default, the Bank would have to pay for the

receivables created by new charges that customers made between the time of the

CompuCredit default and the time that the credit card accounts were shut off.  The Bank

would reduce the amount of the receivables it purchased by the $12 million Contingency

Funding Plan Account that CompuCredit provided to the Bank as protection against such

an occurrence; however, the Contingency Funding Plan Account may not cover all of the

receivables created by new customer charges.

30.     If CompuCredit defaults, the Bank would be required to increase its "allowance

for loan and lease losses" (ALLL) to absorb estimated credit losses for any receivables it

purchased and that remained on its books after it applied CompuCredit's $12 million

Contingency Funding Plan Account.  The Federal banking agencies' *Expanded Guidance

for Subprime Lending Programs*, FIL-9-2001 (Jan. 31, 2001) (Subprime Guidance),

accounts for the extra risks associated with subprime lending and states that the portion of

the ALLL allocated to subprime portfolios must be sufficient to absorb estimated credit

losses for this portfolio.  The term "estimated credit losses" means the amount not likely

to be collected; *i.e.*, the amount lost after accounting for charge-offs.  Based on the March

31, 2008 charge-off rates reported by CompuCredit, the Bank could reasonably expect to

charge-off 20-30% of new receivables, which does not include losses related to fees and

finance charges that the Bank would also incur. This requires the Bank to increase its ALLL in a dollar amount equal to 20-30% of the new receivables plus related fees and finance charges. This transaction would reduce the Bank's income.

31.    Additionally, the Bank would be required to hold adequate capital against any receivables it purchased and that remained on its books after it applied CompuCredit's $12 million Contingency Funding Plan Account. The Subprime Guidance states that the minimum capital requirements generally apply to portfolios that have substantially lower risk profiles than exist in subprime loan programs. Therefore, these requirements are not likely sufficient to account for the risks associated with subprime portfolios. Given the higher risk inherent in subprime lending programs, a bank should hold capital against such portfolios in an amount that is one and one half to three times greater than what is appropriate for similar non-subprime assets. Banks with programs subject to the Subprime Guidance should have capital ratios that are well above the averages for other similarly situated banks that are not engaged in subprime lending. Given the performance of the existing credit card receivables, as documented in CompuCredit's March 31, 2008 Form 10-Q, capital in an amount three times greater than what would be appropriate for non-subprime credit card receivables is appropriate.

32.    Although exact numbers for additional capital and ALLL requirements would not be known until a default occurred and the Bank had to fund or purchase the newly created receivables, there is substantial risk that the additional capital and ALLL needed would exceed the Bank's existing resources. The Bank is subjecting itself to millions of dollars of monetary risk. Currently the Bank has $36.4 million in capital reserves. However, the Bank has not assessed the risks of a CompuCredit default, the possible funding

12

requirements in a CompuCredit default scenario and the ensuing risks to the Bank.

Because neither the recent ramp up in business described in paragraphs 22 and 23 nor the

additional obligations being considered, as described in paragraph 33 below, are reflected

or accounted for on the Bank's balance sheet, the current capital figures do not and will

not account for the additional risks they pose. The Bank has not taken any steps to

reassess its capital reserves and account for these risks.

33.     In early July 2008, representatives of another FDIC-insured institution, Columbus

Bank and Trust Company, Columbus, Georgia (CBT), advised the FDIC that it intended

to imminently transfer to the Bank 392,283 subprime credit card accounts owned by

CBT, but marketed and serviced by CompuCredit (CBT Accounts). The CBT Accounts

have a total outstanding balance due of approximately $219,678,886 and total aggregate

available credit of approximately $21,000,000. CBT is the subject of a Stipulated Cease

and Desist Order issued by the FDIC based, in part, on the FDIC's information and belief

that inadequate oversight of subprime credit card accounts led to violations of consumer

protection laws. The proposed expansion of the Bank's subprime lending activities has

the distinct possibility of further straining the Bank's weak infrastructure both financially

and managerially.

34.     As Regional Director, I have many concerns about the imminent transfer of the

392,283 subprime CBT Accounts to the Bank based upon the above information as well

as additional information available to me and after discussing the transfer with

Supervisory Examiner Colleen M. Marano and considering the contents of her

declaration in this matter. Given the Bank's failure to: adequately oversee, monitor, or

restrict the growth of its third party subprime lending activities without implementing the

13

necessary infrastructure to determine and adequately assess and mitigate the risks associated with those third party subprime lending programs; obtain and analyze the financial information it receives from third parties related to credit losses and cardholder delinquencies; and that the current FDIC examination thus far indicate the Bank is currently operating in contravention of the Safety and Soundness Guidelines; allowing the Bank to acquire any new portfolios of subprime credit card accounts pose grave legal, compliance, and reputation risks; funding risk; credit risk; and operational risk to the Bank.

35.    Allowing the Bank to expand the volume of its credit card activities without implementing the necessary infrastructure to determine and adequately assess the risks associated with its credit card lending activities and to successfully mitigate the associated risks is likely to cause a significant dissipation of the Bank's assets or earnings, or is likely to weaken the condition of the Bank, or otherwise prejudice the interests of the Bank's depositors.

36.    Based on the above information as well as additional information available to me, I decided to recommend that a Temporary Order to Cease and Desist should be issued against the Bank to prevent the Bank from acquiring one or more portfolios of subprime credit card accounts, given the unsafe and unsound practices evidenced in the Bank's existing subprime credit card programs and the additional risks in expanding the programs would pose to the Bank and the Deposit Insurance Fund.  The Temporary Order to Cease and Desist is not an outright prohibition on acquiring additional portfolios of high-risk subprime credit card accounts.  Rather, the Temporary Order prevents the Bank from acquiring said portfolios until such time that the Bank submits an appropriate

operating and capital plan that assesses and mitigates all the risks and I am able to

provide my non-objection to the plan.


      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on July 3 1, 2008.


Doreen R. Eberley
Regional Director

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|                                                      |     |                          |
| ---------------------------------------------------- | --- | ------------------------ |
| FIRST BANK OF DELAWARE,                              | )   |                          |
| WILMINGTON, DELAWARE,                                | )   |                          |
|                                                      | )   |                          |
| Plaintiff,                                           | )   |                          |
| v.                                                   | )   | C.A. No. 08-429 (GMS)    |
|                                                      | )   |                          |
| FEDERAL DEPOSIT INSURANCE                            | )   |                          |
| CORPORATION,                                         | )   |                          |
|                                                      | )   |                          |
| Defendant.                                           | )   |                          |

### DECLARATION OF COLLEEN M. MARANO

I, Colleen M. Marano, do hereby aver that:

1.      I have been employed by the Federal Deposit Insurance Corporation (FDIC) for

15 years. I received a Bachelor of Arts degree from College Misericordia, Dallas,

Pennsylvania. I am currently enrolled in the ABA Stonier Graduate School of Banking.

From June 1993 to June 1996, I was an Assistant Examiner in the FDIC's Philadelphia

and Claymont Field Offices. From June 1996 until November 2003, I was an Examiner.

Currently, I am a Supervisory Examiner in the Claymont, Delaware Field Office, New

York Regional Office, Division of Supervision and Consumer Protection, and have held

that position since November 2003. I report to New York Regional Director Doreen R.

Eberley through my field office supervisor. I also coordinate and share information with

the Delaware Office of the State Bank Commissioner. I have personal knowledge of the

facts set forth in this Declaration.

2.      As a Supervisory Examiner at the FDIC, I have direct responsibility for the risk

management examination staff in the Claymont Field Office, which has primary

supervisory responsibility of the state nonmember financial institutions located in Delaware, including the First Bank of Delaware, a state-chartered bank with its principal place of business in Wilmington, Delaware (Bank).

3.    I have a thorough knowledge and understanding of the FDIC's rules and regulations, financial institution letters, policies and guidance applicable to banks, including the Interagency Guidelines Establishing Standards for Safety and Soundness, 12 C.F.R. Pt. 364, App. A (Safety and Soundness Guidelines); the FDIC Credit Card Activities Manual; and industry best practices relating to credit card banks.

4.    Approximately 40% of my work is conducting bank examinations. I have participated in over 75 bank examinations, including 26 examinations of credit card specialty institutions, Rent-A-Bank Identification Number (Rent-A-BIN) arrangements, as well as various non-traditional lending institutions, and other niche financial institutions of various asset sizes. Rent-A-BIN arrangements allow third parties to conduct credit card lending activities with a bank's identification number (BIN), which is a number assigned by a credit card Association, such as Visa and MasterCard (Associations), as identification for the bank for processing credit card transactions. The Associations' rules only allow banks to issue Visa or MasterCard credit cards. In return for allowing the use of its BIN, the bank receives a "rental" fee from the third party, hence the "Rent-A-BIN" arrangement.

5.    From 2005 through the present, as the Supervisory Examiner, I participated in the examinations of the Bank and various meetings with Bank management, and I performed numerous other supervisory and examination duties related to the Bank.

2

6.      I participated in the April 2006 and April 2007 risk management examinations of
the Bank. Both examinations cited the Bank for numerous unsafe or unsound banking
practices and violations of law with respect to third party lending programs that the Bank
offers to consumers through vendors, service providers, Rent-A-BIN arrangements, and
other third parties (third party lending programs).

7.      The Bank's National Consumer Products Division (NCP Division) primarily
targets "subprime" borrowers, who typically have poor credit histories that may include
payment delinquencies, charge-offs, judgments, and bankruptcies. They may also display
reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other
criteria that may encompass borrowers with incomplete credit histories. Loans to such
borrowers have a higher risk of default than loans to prime borrowers.

8.      Each day the Bank sells its credit card product receivables to third parties. The
Bank depends on these third parties to purchase the credit card receivables on a daily
basis because financially, the Bank cannot afford to retain the credit card receivables on
its books, which is demonstrated by its contingency plans, described in paragraphs 15-16.
If any of the third parties were unable to meet their daily obligation to purchase the credit
card receivables, the Bank could not afford to carry the credit card receivables on its
books for several days without endangering its financial stability, nor does the Bank have
the capability to service a large volume of credit card accounts.

9.      During the April 2006 examination, Bank management was unable to provide
reports, data or analysis demonstrating that the Bank was effectively and properly
managing, evaluating, and overseeing its credit card portfolios. For example, the Bank
lacked basic credit card portfolio performance data indicating delinquency rates and

3

trends, overlimit authorization strategies and negative amortization trends. The April 2006 examination cited the Bank for its failure to: adequately monitor its third party lending programs, including its third party credit card programs; develop and implement adequate internal controls and monitoring of basic account performance; implement appropriate and effective risk management; hire and retain sufficient staff to oversee and monitor its high risk consumer loan products; and establish independent audit procedures.

10.    As part of the April 2007 examination, the examination staff and I reviewed the Bank's NCP Division, which houses the Bank's third party lending programs that primarily market subprime credit products. The NCP Division included, among other credit products: four installment loan programs offered, serviced and marketed by third parties; one third party credit card for financing dental expenditures; one third party credit card predicated on advancing a percentage of annual wages; two third party life insurance premium products; five third party stored value card products; and two third party subprime credit card products, including the subprime credit card accounts owned by the Bank, but offered, marketed, and serviced by CompuCredit Corporation (CompuCredit).

11.    As of March 31, 2007, the total outstanding loan balance for all NCP Division products was $287.8 million, ten times the Bank's capital at that time. Subprime credit card receivables represented more than 85% of that balance. Twelve months later on March 31, 2008, the total outstanding loan balance for all NCP Division products increased more than two-fold to $682 million, which represented more than 18 times the Bank's capital reserves. Subprime credit card receivables represented approximately

80% of that balance. This demonstrates the Bank's rapid "ramp up" in volume of business related to its subprime credit card products.

12.    The 2007 examination again cited the Bank for significant deficiencies in its oversight and management of its third party credit card lending activities. Serious deficiencies were noted due to the recurring and persistent weaknesses in the Bank's evaluation of its third party lending programs. The Bank added three high-risk subprime loan programs between the 2006 and 2007 examinations. The 2007 examination noted that the Bank's Board did not adequately review these new loan programs. The Bank also failed to: (1) effectively assess and evaluate its third party lending partners; (2) implement an effective risk management program to identify risks in its consumer lending activities, including its credit card programs; and (3) retain sufficient and qualified personnel to monitor and oversee its third party lending programs. Additionally, the Bank failed to adequately address, monitor, and mitigate the increasing risk levels associated with the explosive growth in its subprime credit card lending activities and failed to implement effective capital planning.

13.    I am currently participating in the ongoing risk management examination of the Bank that began on June 23, 2008 and is continuing. Thus far, the current examination indicates that the Bank continues to engage in unsafe and unsound banking practices in that the Bank has been, among other things, operating with an inadequate system of internal controls; operating with an inadequate management information system; operating with an inadequate compliance management system to ensure compliance with all federal consumer protection laws, including, but not limited to section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (Section 5). For example, the Bank is

obtaining various reports from CompuCredit; however, it is not analyzing the information adequately, nor is it utilizing the information to manage and make appropriate and necessary changes to its compliance management systems or its internal control systems and practices.

14.    Bank management has not adequately monitored or assessed the risks of doing business with its third party lending partners, especially in light of the Bank's rapid growth in its subprime loans, credit cards issued, and credit card receivables, as described in paragraph 11 above. The Federal banking agencies' *Expanded Guidance for Subprime Lending Programs*, FIL-9-2001 (Jan. 31, 2001) requires banks to recognize the additional risks inherent in subprime lending due to the consumer's lower credit profile and higher default rates, and to determine if those risks are being adequately controlled and properly managed given the bank's staff, financial condition, size, and level of capital support. The Bank's subprime credit card lending policies and practices are unsafe and/or unsound in that they are inadequate, deficient, and fail to properly manage and control these risks. Also, the Bank has not retained sufficient and appropriately trained staff to adequately monitor its third party lending programs from both a financial and compliance perspective.

15.    In the event that CompuCredit fails to purchase the credit card receivables from the Bank, as required under the terms of their agreement, the Bank has a "Contingency Funding Plan" (last updated in February 2007) for its subprime CompuCredit credit card accounts. The Contingency Funding Plan estimates a five day timeline for implementation, however, the Bank only maintains reserve funds to cover the anticipated credit card receivables for four days. Additionally, the Contingency Funding Plan does

not account for other significant capital, reputation, counterparty, funding, credit, and operational risks in the event that CompuCredit's fails to purchase the credit card receivables.

16.    Prior to May 31, 2008, CompuCredit had $2,000,000 on deposit in the Contingency Funding Plan account and provided the Bank a letter of credit as back up contingency funding. The letter of credit expired on May 31, 2008 and was replaced with an additional $10 million in cash reserves. As of May 31, 2008, the Contingency Funding Plan account contained $12 million. There is, however, no corresponding assessment by the Bank indicating that this amount adequately mitigates the risks associated with a CompuCredit default.

17.    The Bank has not analyzed the Contingency Funding Plan provisions to ensure they are sufficient to cover the risks in the event CompuCredit fails to purchase the credit card receivables. For example, the Plan does not include provisions to reimburse consumers for prepaid annual fees if their credit cards have to be shut off, nor does it include the significant costs and expenses of servicing these accounts. The Bank does not have satisfactory strategies or contingency plans in place to deal with scenarios in which the Bank's other third party lending program partners are unable or unwilling to purchase the subprime loans and credit card receivables from the Bank as required by the terms of their respective agreements.

18.    The Bank's exact monetary exposure in the event of a CompuCredit default is not known, however, the various risk components are known. An adequate risk analysis would indicate the range of potential outcomes for each risk component and the most likely outcome, based on research and industry trends. For example, one risk component

7

to be analyzed is the amount of receivables that would have to be funded or purchased in the event of a CompuCredit default. If the value of the subprime credit card receivables to be funded or purchased by the Bank exceeds the $12 million in the Contingency Funding Plan account, the Bank must book and carry the remaining receivables on its balance sheet. If the Bank carries subprime receivables on its balance sheet, the Bank is then required to both increase its "allowance for loan and lease losses" (ALLL) to account for the additional estimated credit losses associated with the high-risk subprime loans and increase its capital reserves to account for the added risk in the Bank's balance sheet. The Bank has not provided the FDIC with documentation indicating it has analyzed the range of outcomes and determined the most likely outcome, such that the $12 million Contingency Funding Plan account could be considered sufficient to protect the Bank from undue capital, liquidity, and credit risk exposure.

19.    On or about mid-June 2008, Doreen Eberley informed me that CompuCredit requested that another FDIC-insured institution, Columbus Bank and Trust Company, Columbus, Georgia (CBT), transfer to the Bank, 392,283 subprime credit card accounts owned by CBT, but serviced by CompuCredit (CBT Accounts). I later learned that the CBT Accounts had a total outstanding balance due of approximately $219,678,886 and total available credit of approximately $21,000,000.

20.    I also learned that the CBT Accounts were the subject of a Stipulated Cease and Desist Order between the FDIC and CBT based on the FDIC's information and belief that the marketing of the credit card accounts violated Section 5.

21.    I was also informed that CBT filed a lawsuit against CompuCredit for CompuCredit's alleged refusal to comply with the *Interagency Account Management and*

8

*Loss Allowance Guidance for Credit Card Lending*, FIL-2-2003 (Jan. 8, 2003) (AMG) as the AMG relates to the CBT Accounts and how consumer's minimum payments should be calculated and sufficient to ensure that the consumer pays down the principal owed.

22.     The Bank has not assessed or accounted for the added compliance, reputation, counterparty, funding, credit, and operational risks posed by acquiring approximately 392,283 additional subprime credit card accounts. Specifically, the Bank has not demonstrated that it investigated or documented the risks associated with the CBT Accounts, which the Bank knows are implicated in three lawsuits – CBT's lawsuit against CompuCredit, Federal Trade Commission's lawsuit against CompuCredit, and the FDIC's administrative action against CompuCredit.

23.     Given the inadequacies of the Bank's management and supervision of the Bank's third party subprime credit card lending policies and practices, and given that the examinations thus far indicate the Bank is currently operating in contravention of the Safety and Soundness Guidelines relating to the Bank's continued failure to adequately oversee and monitor its third party lending programs, allowing the Bank to acquire any new portfolios of subprime credit card accounts poses grave compliance, reputation, counterparty, funding, credit, operational, and capital risks to the Bank.

24.     Allowing the Bank to expand the volume of its credit card activities without implementing the necessary infrastructure to determine and adequately assess the risks associated with its credit card lending activities and to successfully mitigate the associated risks is likely to cause a significant dissipation of the Bank's assets or earnings, or is likely to weaken the condition of the Bank, or otherwise prejudice the interests of the Bank's depositors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2008.

Colleen M. Marano
Supervisory Examiner